UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

GRAHAM PACKAGING COMPANY, L.P.                    Plaintiff/Counter-Defendant

v.                                                Case No. 3:23-cv-110-RGJ-RSE

RING CONTAINER TECHNOLOGIES, LLC                  Defendant/Counter-Claimant

* * * * *

**MEMORANDUM OPINION & ORDER**

Defendant and Counter-Claimant Ring Container Technologies, LLC ("Ring") filed an amended answer and counterclaims with the Court's permission. [DE 74].[1] Plaintiff and Counter-Defendant Graham Packaging Company, L.P. ("Graham") now moves to dismiss Ring's new counterclaims and to strike Ring's newly raised defense. [DE 89-2]. Ring responded [DE 107] and Graham replied [DE 128]. For the following reasons, Graham's motion is **DENIED**.

## I. BACKGROUND

Graham is a Delaware limited partnership headquartered in Pennsylvania. [DE 1 at 3]. The company describes itself as "a leader in the design, manufacture, and sale of innovative food, beverage, household, and automotive containers." [*Id.* at 1]. Relevant here, Graham provides customers in the food and beverage industry with containers for oxygen-sensitive products. [*Id.*]. Ring is a limited liability company organized and headquartered in Tennessee. [DE 1 at 4; DE 74 at 4651]. Like Graham, Ring provides containers for customers in the food and beverage industry. [DE 74 at 4651]. The parties are competitors. [*Id.* at 4689].

Since 2022, Graham has owned U.S. Patent No. 11,345,809 ("the Patent"), entitled *Oxygen Scavenging Compositions Requiring No Induction Period*. [DE 1-1]. According to Graham,

---

[1] Some relevant documents, including Ring's amended pleading, have been filed both under seal and in redacted form. This opinion cites the publicly available redacted docket entries.

historically, food and beverage manufacturers have needed to store empty product containers for days or weeks before filling them; this "induction period" is generally necessary "to allow beneficial oxygen scavenging characteristics of the packaging material to become active." [DE 1 at 2]. Graham's patented invention produces "a container that . . . provides oxygen scavenging characteristics without the need for costly and logistically disruptive induction periods." [*Id.*]. One key aspect of the invention is a polyethylene terephthalate ("PET") layer "that is substantially free of antimony."[2] [*Id.* at 6; *see also* DE 1-1 at 35].

### A. Procedural Background

Graham's complaint alleges that Ring has infringed the Patent. [DE 1 at 4–6]. Ring's initial answer and counterclaims denied that its technology infringed. [DE 14 at 91, 96]. In that pleading, Ring also asserted two counterclaims under Missouri and Tennessee law respectively for bad-faith claims of patent infringement. [*Id.* at 106–08]. On Graham's motion, the Court found that Kentucky law—which provides no such cause of action—governs this dispute and, as a result, Ring's counterclaims were dismissed. [DE 53 at 769–70].

After a period of discovery, the Court permitted Ring to file an amended pleading. [DE 73]. The amended pleading asserts a new affirmative defense and two new counterclaims. [DE 74 at 4657–93]. At this stage, the Court accepts as true the allegations in Ring's pleading and construes them in the light most favorable to Ring. *See United Food & Com. Workers Union-Emp. Pension Fund v. Rubber Assocs.*, 812 F.3d 521, 524 (6th Cir. 2016) (counterclaims); *cf. Operating Eng'rs Loc. 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (affirmative defense).

---

[2] According to the Patent, antimony (Sb) is a commonly used catalyst in PET bottle production. [DE 1-1 at 31–32]. "[B]y maintaining a sufficiently low concentration of antimony," the patented invention forms a bottle "without any significant induction period." [*Id.* at 26]. While there are other ways to reduce induction periods, those methods can cause recyclability issues and other problems. [*Id.* at 25].

**B. Ring's Allegations**

Nonparty "Indorama" supplies materials for manufacturers like Graham.[3] Indorama's "Oxyclear" products include Oxyclear 3500, an "oxygen barrier material," and Oxyclear 2310, a "PET resin." [DE 74 at 4663–64]. Together, Oxyclear 2310/3500 makes "bottles . . . that required no induction period." [*Id.* at 4664]. According to Ring, Graham has known of Oxyclear since 2012 and has extensively tested Oxyclear 2310/3500. [*Id.* at 4654–65]. ████████████████

████████████████████████████████████████ [*Id.* at 4680]. ████████

████████████████████████████████████████████████

████████████████ [*Id.* at 4680]. ████████████████████████

████████████████████████████████████ [*Id.* at 4681]. ████████

████████████████████████████████████████████ [*Id.* at 4667–68, 4681]. ████████████████████████████████████

████████████████████████████ [*Id.* at 4666].

The record indicates that Graham first applied for the Patent in 2014 or 2015. [DE 1-1 at 16, 25]. According to Ring, Graham initially "sought broad[] claims to a composition," but the composition was rejected as obvious, meaning it would have been readily apparent to a person of ordinary skill in the relevant field. [DE 74 at 4660–61]; *accord* 35 U.S.C. § 103. The patent prosecution that ultimately resulted in the Patent at issue here took seven years. [DE 74 at 4660].

By early 2021, Graham was "increasingly concerned that [Ring's] accused products had achieved industry recognition for key innovations." [*Id.* at 4678]. ████████████████████

████████████████████████████████████████████████

---

[3] Ring's initial pleading identified "Indorama Ventures" as "a supplier to Graham . . . since at least 2013." [DE 14 at 104–05]. Ring's amended pleading and Graham's motion suggest that Indorama also supplies other market competitors, such as "Amcor," with materials. [DE 74 at 4686; DE 89-2 at 2323, 2328].

[*Id.* at 4678–79].  [*Id.* at 4679].

[*Id.*].

[*Id.*].

In late 2021 and early 2022, Graham submitted to the U.S. Patent and Trademark Office ("PTO") declarations by employee John Denner. [*Id.* at 4661–63]. In his first declaration, Denner "swore that . . . 'all known commercial monolayer scavengers at the time required an aging period prior to filling.'" [*Id.* at 4661]. He claimed that high antimony was to blame and that Graham had both kept and gained customers thanks to its "antimony free PET scavenger material." [*Id.* at 4661–62]. But the PTO still rejected Graham claims and arguments. [*Id.* at 4662]. Denner's second declaration "aimed to make the claims 'commensurate in scope' with [Graham's] arguments concerning commercial success and the problem solved." [*Id.* at 4662–63]. Thereafter, the PTO allowed the Patent. [*Id.* at 4663].

Ring accuses Graham of three misdeeds before the PTO. First, Ring claims that Indorama's Oxyclear 2310/3500 constituted a "prior art composition" that Graham "intentionally concealed." [*Id.* at 4663, 4670]. Graham disclosed using Oxyclear 3500 with a "high antimony" material, but it "concealed the fact that Indorama actually had already made, sold, used and marketed Oxyclear® 2310 PET 'low antimony' resin specifically recommended for use with Oxyclear® 3500." [*Id.* at 4668]. Graham knew that Oxyclear 2310/3500 "resulted in a bottle that would have fully met at least claim 21" of the Patent.[4] [DE 74 at 4664–66].

Second, Ring claims that Graham intentionally concealed its own materials and test results that were inconsistent with its patent application. [*Id.* at 4671]. The Patent correlates "high levels

---

[4] Claim 21 covers in part a "composition" of "[PET] that is substantially free of antimony," "an oxidizable polyether-based additive," and "a transition metal catalyst, wherein the transition metal catalyst comprises cobalt." [DE 1-1 at 35].

of antimony" with a need for "an induction period." [DE 1-1 at 26]. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ [DE 74 at 4671–73,

4677]. Graham instead submitted "intentionally false and misleading examples" to the PTO to

bolster its claim that "'high antimony' resin caused an induction period." [*Id.* at 4674].

Finally, Ring claims that some of Denner's statements to the PTO were materially false.

[*Id.* at 4678]. Denner swore "that . . . 'all known commercial monolayer scavengers at the time

required an aging period prior to filling,' and that Graham Packaging 'discovered that antimony

(Sb) was the reason for this induction period or delayed activation of the O2 scavenger.'" [*Id.* at

4679]. "But he knew that Indorama's Oxyclear® 2310/3500 prior art composition was

commercial, had no induction period and did not require ageing." [*Id.* at 4679–80]. Because

Graham knew that "Indorama had already invented, made, marketed and sold Oxyclear® 2310, a

low antimony resin," Graham could not have discovered "that using low antimony avoided an

induction period." [*Id.* at 4681].

## C. Ring's Affirmative Defense and Counterclaims

Ring's new pleading maintains that Ring did not infringe Graham's patent. [DE 74 at 4651,

4655–56]. The pleading also asserts a new affirmative defense: "inequitable conduct and unclean

hands," rendering the Patent "unenforceable." [*Id.* at 4657–58]. Additionally, the new pleading

asserts two new counterclaims. The first seeks a declaratory judgment that the Patent is "invalid

and/or unenforceable." [*Id.* at 4683]. The second is an antitrust counterclaim under Section 2 of

the Sherman Act for "actual or attempted monopolization." [*Id.* at 4684]. Ring claims that Graham

has injured Ring and other market participants by, among other things, "threaten[ing] to suppress

superior technology" and "sow[ing] doubt" about Ring's "continued ability to supply customers."

[*Id.* at 4689, 4692].

Graham now moves to strike Ring's new affirmative defense and to dismiss both of Ring's new counterclaims. [DE 89-2].

## II. STANDARD

A claim may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also United Food & Com. Workers*, 812 F.3d at 524 (counterclaims). To survive a motion to dismiss, a pleading must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Th[e] court must accept all well-pleaded factual allegations of the counterclaim as true and construe the counterclaim in the light most favorable to the claimant." *United Food & Com. Workers*, 812 F.3d at 524 (cleaned up); *see also Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020). Factual allegations must be more than "speculative," and "conclusory allegations or legal conclusions" will not suffice. *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 435 (6th Cir. 2016) (quotation marks omitted); *see also Marchek v. United Servs. Auto. Ass'n*, 118 F.4th 830, 833 (6th Cir. 2024). It is the movant's burden to establish that the challenged pleading fails to state a plausible claim for relief. *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859 (6th Cir. 2023).

A district court may strike an "insufficient defense." Fed. R. Civ. P. 12(f). However, "[m]otions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Loc. 324*, 783 F.3d at 1050. "[D]isputed or substantial issues of law . . . quite properly are viewed as best determined only after further development by way of discovery and a hearing on the merits." *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 499 (6th Cir. 2022) (quotation marks omitted). A defense should be struck only if is appears certain that the plaintiff

will succeed "despite any state of the facts which could be proved in support of the defense and are inferable from The pleadings." *Operating Eng'rs Loc. 324*, 783 F.3d at 1050 (quoting *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991)).

Generally, a "claim for relief" is sufficiently pleaded if it "contain[s] . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Most affirmative defenses need only be "affirmatively state[d]" "in short and plain terms." Fed. R. Civ. P. 8(b)–(c). But "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requirement covers both claims for relief and affirmative defenses, including the defense of inequitable conduct. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326–27 (Fed. Cir. 2009); *see also UUSI, LLC v. United States*, 133 Fed. Cl. 263, 269 (2017). In a patent case, "Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1327. "Pleading on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.* at 1330.

### III. ANALYSIS

Graham argues that Ring's allegations lack the particularity required by Rule 9(b) and related caselaw. [DE 89-2 at 2301]. At issue are the Oxyclear products that potentially constitute prior art, the information Graham allegedly withheld from the PTO, and Denner's allegedly false statements to the PTO. Graham also argues that Ring has failed to plead an antitrust counterclaim for actual or attempted monopolization. [*Id.* at 2315].

#### A. Ring's Inequitable Conduct Defense

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed.

Cir. 2011) (en banc). Because this defense threatens such "far-reaching consequences," in *Therasense*, the Federal Circuit "tighten[ed] the standards" that apply "in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1289–90. "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244, 1252 (Fed. Cir. 2024) (quoting *Therasense*, 649 F.3d at 1287). "Except in cases of egregious misconduct, the materiality must reach the level of but-for materiality," meaning the PTO would not have allowed a claim if it was aware of the applicant's omission or misrepresentation. *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016); *see also Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013). "Intent to deceive may be found only if specific intent to deceive is 'the single most reasonable inference able to be drawn from the evidence.'" *TransWeb*, 812 F.3d at 1304 (quoting *Therasense*, 649 F.3d at 1290). "If more than one reasonable inference is possible, 'intent to deceive cannot be found.'" *Id.* (quoting *Therasense*, 649 F.3d at 1290–91). However, "[a] court 'may infer intent from indirect and circumstantial evidence' because 'direct evidence of deceptive intent is rare.'" *Id.* (quoting *Therasense*, 649 F.3d at 1290).

Graham argues that Ring has failed to adequately plead its fraud allegations and, therefore, the Court should strike Ring's inequitable-conduct affirmative defense. [DE 89-2 at 2315]. Ring responds that its affirmative defense "certainly meets the 'fair notice' standards." [DE 107 at 2501].

### 1. *Oxyclear as Prior Art*

Ring's pleading alleges that, but for Graham's lack of disclosure of prior art, Claim 21 would have been rejected as "anticipated," meaning that the invention already exists as a single prior art reference. [DE 74 at 4670]; *accord* 35 U.S.C. § 102. Graham's motion argues that Ring

has neither presented a valid prior-art reference nor adequately pleaded materiality and intent on this issue. [DE 89-2 at 2301–10].

i.    *The Reference at Issue*

For its inequitable-conduct defense, Ring must show, among other things, "that Graham failed to disclose a *single reference* that teaches all of the limitations of Claim 21," i.e., a failure to disclose a reference that is "but-for material" to patentability. [DE 88 at 2160 (citing *Therasense*, 649 F.3d at 1291)]. Graham argues that "Ring's pleading makes vague and alternative references" to at least six "alleged 'prior art' references," not a single reference but an amalgam of documents. [DE 89-2 at 2303]. Ring's response asserts that "the prior art 'reference'" it "relies upon is the 'on sale' Indorama Oxyclear® 2310/3500 product" itself, not any bottle using Indorama's technology. [DE 107 at 2483]. Graham's reply then argues further that Ring has not identified any "prior art bottle" on sale. [DE 128 at 2774].

Under 35 U.S.C. § 102, a prior art reference for purposes of proving anticipation may be a patent, printed publication, or subject matter that was either publicly disclosed or on sale before filing the patent application. "A patent claim is anticipated if a *single* prior art reference expressly or inherently discloses every limitation of the claim." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252 (Fed. Cir. 2014) (emphasis added). Where the reference is a printed publication or patent, the reference must be a single document. *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). However, this is not the case for a prior public disclosure or "on sale" product. *See Wilco Marsh Buggies & Draglines, Inc. v. Weeks Marine, Inc.*, No. 20-3135, 2023 WL 4624744, at *2–3 (E.D. La. July 19, 2023) (collecting cases) ("[W]hen a *device* is being offered as prior art, the features of that device may be proven by multiple pieces of evidence, but when the prior art is a patent or a prior publication, then each element of the claimed invention must appear within the four corners of that document."); *see also*

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1373–75 (Fed. Cir. 2017), *aff'd,* 586 U.S. 123 (2019). As Ring relies on an "on sale" subject matter, "[m]ultiple documents that describe a single prior art device count as a single prior art reference" because "[i]n this situation, it is the device that is the asserted prior art; the documents are merely evidence to describe it." *Altera Corp. v. PACT XPP Techs.*, AG, No. 14-cv-02868-JD, 2015 WL 3830982, at *3 (N.D. Cal. June 19, 2015). Additionally, Graham's argument over whether "withheld material" was "publicly accessible" [DE 89-2 at 2305] fails for the same reason, as Ring's supporting documents are not the purported prior art in this case. Since Oxyclear 2310/3500 is the "on sale" subject matter that allegedly constitutes prior art, the relevant questions are whether Oxyclear 2310/3500 was material to Graham's claim and, if so, whether Graham concealed it with intent to deceive the PTO.

### ii. *Materiality and Intent*

"Inequitable conduct has two separate requirements: materiality and intent." *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017). "[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality." *Id.* (quoting *Therasense*, 649 F.3d at 1291). "A prior art reference is 'but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.'" *Id.* (quoting *Therasense*, 649 F.3d at 1291). On the other hand, a reference cannot be but-for material "if it is merely cumulative." *Id.* (citing *Dig. Control Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1319 (Fed. Cir. 2006)). "A reference is cumulative when it 'teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.'" *Id.* (quoting *Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997)). Graham argues that "Ring has . . . failed to adequately allege that the Oxyclear 2310/3500 materials . . . are not cumulative of art that was provided to the Patent Office." [DE 128 at 2775]. But Ring did plead that "the

Oxyclear® 2310/3500 prior art is not cumulative of anything before the PTO." [DE 74 at 4671]. Ring argues that presentation of Oxyclear 2130/3500 would not have been cumulative because it would have raised an on-sale bar issue not otherwise disclosed to the PTO. [DE 107 at 2486]; *accord* 35 U.S.C. § 102. Here, "taking the facts in the light most favorable to [Ring], the sale of [Oxyclear 2130/3500] could have provided additional information to the [PTO], making it not cumulative." *See Star Envirotech, Inc. v. Redline Detection, LLC*, No. SACV 12-01861 JGB (DFMx), 2015 WL 4744394, at *5 (C.D. Cal. Jan. 29, 2015).

"In addition to proving the materiality of [the] withheld reference[], 'the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO.'" *Regeneron Pharms.*, 864 F.3d at 1350 (quoting *Therasense*, 649 F.3d at 1290). Graham argues that Ring has "fail[ed] to plead intent to deceive the Patent Office" regarding the Oxyclear prior art. [DE 89-2 at 2309]. But Ring's pleading alleges that Graham's representatives "intentionally concealed the Indorama Oxyclear® 2310/3500 prior art composition and bottles from the PTO." [DE 74 at 4668]. Graham also challenges some of Ring's allegations pleaded "upon information and belief." [DE 89-2 at 2309]. However, even under Rule 9(b)'s heighted requirements, such allegations are "permitted . . . when essential information lies uniquely within another party's control," so long as "the pleading sets forth the specific facts upon which the belief is reasonably based." *Exergen*, 575 F.3d at 1330. Ring's pleading does so. [DE 74 at 4663–66]. Graham also argues that even if it "knew of a reference, should have known of its materiality, and decided not to submit it to the PTO," such information without more "does not prove specific intent to deceive." [DE 89-2 at 2310 (quoting *Therasense*, 649 F.3d at 1276)]. But Ring has pleaded more than that. Specifically, Ring's pleading alleges that Graham chose to disclose Oxyclear 3500 but not Oxyclear 2310 (a low-antimony resin) and to instead discuss using Oxyclear 3500 with a "high antimony" resin.

[DE 74 at 4668]. As a result, Ring has adequately pleaded that Oxyclear 2310/3500 constituted material prior art intentionally withheld to deceive the PTO.

### 2. *Graham's Tests and Findings*

Ring's pleading alleges that Graham unlawfully concealed from the PTO Graham's own materials and test results that were inconsistent with the patent application. [DE 74 at 4671]. Graham's motion challenges both materiality and intent regarding those allegations.

Graham first argues that the data at issue was immaterial because it "was actually faulty and resulted from testing of flawed samples that did not accurately represent the performance of bottles with high antimony." [DE 89-2 at 2311]. According to Graham, "*aged*, rather than new, preforms" were to blame. [*Id.* (emphasis in original)]. Graham claims it "recognized this problem, subsequently re-ran the testing with corrected sample bottles made from freshly molded preforms, and disclosed that accurate testing data" to the PTO. [*Id.*]. In response, Ring asserts that "whether the bottles are made from aged or fresh preforms is *wholly irrelevant*." [DE 107 at 2490 (emphasis in original)]. While according to Graham, its position is "a clear and logical explanation" of what happened [DE 128 at 2776], the Court cannot weigh evidence or make inferences in Graham's favor at this stage. *See United Food & Com. Workers*, 812 F.3d at 524. Ring's pleading alleges that Graham concealed contradictory information from the PTO and instead submitted "false and misleading examples" to bolster its claims. [DE 74 at 4671, 4674]. ██████████████ ████████████████████████████████████████████████████ ██████████████████████████ [*Id.* at 4673]. Ring's allegations meet Rule 9(b)'s particularly requirement, *see Exergen*, 575 F.3d at 1327, and the Court must accept them at this stage.

Figure 4 to the Patent illustrates oxygen ingress data across five weeks for various PET bottles. [DE 1-1 at 21, 26]. The Patent represents that "Comparative Example 3 . . . showed a high

oxygen ingress . . . in just 3 weeks of storage time" and that ingress "continued to increase thereafter." [*Id.* at 32]. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████ [DE 74 at 4674]. Graham's motion argues that Graham's truncation of "data beyond the five weeks shown in Figure 4" is immaterial because "[t]he relevant period of interest for oxygen ingress in relation to this invention is the period right after the bottle is formed, not more than a month after the fact." [DE 89-2 at 2313]. But the Court cannot weigh the relevance of the information at this stage. *See United Food & Com. Workers*, 812 F.3d at 524. Ring has alleged that Graham deliberately omitted data from Figure 4 because it was inconsistent with Graham's theory presented to the PTO. [DE 74 at 4674]. ███████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ [*Id.* at 4757]. These allegations are sufficiently particular under Rule 9(b).

Regarding intent to deceive, Graham also argues that "it is not reasonable to infer form [sic] the foregoing that Graham's personnel intended to deceive the Patent Office by withholding faulty data." [DE 89-2 at 2313]. Graham's reply argues further that on this issue, Ring has accused Graham only of *omitting* information, not presenting overtly false information to the PTO. [DE 128 at 2776]. ███████████████████████

███████████████████████████ [DE 74 at 4675]. Furthermore, "material . . . omission[s]" can be actionable. *Exergen*, 575 F.3d at 1327; *see also Network Signatures*, 731 F.3d at 1242. Ring's pleading clearly alleges that Graham "intentionally omitted" materials which were "inconsistent with the specification description" and which "if disclosed would have led to the

rejection of[] claim 21." [DE 74 at 4677]. "[T]he pleading sets forth the specific facts upon which [Ring's] belief is reasonably based." *See Exergen*, 575 F.3d at 1330. In short, Ring's allegations on this point are adequately pleaded.

### 3. *Denner's Statements*

Denner's first declaration was attached to Ring's pleading and "is a part of the pleading for all purposes." *See* Fed. R. Civ. P. 10(c). That declaration states that "all known commercial monolayer scavengers *at the time* required an aging period prior to filling." [DE 74-1 at 4699 (emphasis added)]. Ring alleges that Denner's assertion was false because "he knew that Indorama's Oxyclear® 2310/3500 prior art composition was commercial, had no induction period and did not require ageing." [DE 74 at 4679–80].

Graham argues that "Ring's assertions fail to plead with particularity how Mr. Denner's statements are false." [DE 89-2 at 2314]. According to Graham, Denner's declaration "refers to his knowledge at a time *prior to* invention," [*id.* (emphasis in original)], while Ring's pleading "point[s] to data from *years later*," [DE 128 at 2779 (emphasis in original)]. Ring responds that the Court must draw factual inferences in its favor at this stage and that "Mr. Denner long knew that there was no induction period problem *at all* with the Indorama prior art or with using Oxyclear 3500." [DE 107 at 2499–50 (emphasis in original)]. Paragraph 5 of Denner's first declaration refers to a project that began "[i]n 2009." [DE 74-1 at 4698]. Paragraphs 6 and 7 discuss work undertaken and, relevant here, the "known commercial monolayer scavengers *at the time*." [*Id.* at 4699 (emphasis added)]. Ring's pleading alleges that Graham learned of Indorama's Oxyclear products in 2012. [4664] Drawing all inferences on this record in Ring's favor, as the Court must do at this stage, Ring's position on the chronology of events is not implausible. It appears possible that by using the phrase "at the time," Denner's statement was referring to a

period in 2012 or later. That, according to Ring, is how the statement was false. *See Exergen*, 575 F.3d at 1327.

Graham also argues that the alleged falsehoods in Denner's declaration would be immaterial and that "Ring's only allegation" regarding materiality, meaning Paragraph 119 of Ring's pleading, is "conclusory." [DE 89-2 at 2314]. Ring accurately argues in response that there is more to Ring's pleading on this point than Paragraph 119. [DE 107 at 2498; *see also* DE 74 at 4678–82]. "[T]he materiality prong of inequitable conduct is met when an applicant files a false affidavit and fails to cure the misconduct." *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1344 (Fed. Cir. 2013). At this stage, the Court must accept Ring's allegations that Graham submitted materially false statements to the PTO and that, consequently, those misrepresentations were material.

* * *

In sum, Ring's allegations regarding Graham's alleged misrepresentations, omissions, and intentions are sufficiently pleaded under Rule 9(b)'s heightened standard for fraud. There is a conceivable set of facts, inferable from the pleadings, which could be proved in support of Ring's inequitable conduct defense. Therefore, the Court will not take the unusual step of striking Ring's tenth affirmative defense at the pleadings stage. *See Operating Eng'rs Loc. 324*, 783 F.3d at 1050.

## B.  Ring's Antitrust Counterclaim

Count II of Ring's pleading is a counterclaim for "actual or attempted monopolization in violation of Section 2 of the Sherman Act." [DE 74 at 4684]; *accord* 15 U.S.C. § 2. Ring claims that Graham "has engaged in anticompetitive and exclusionary practices with the specific purpose and intent to obtain monopoly power in the relevant market." [DE 74 at 4692].

Because this is a patent case, for this antitrust counterclaim to reach the merits, Ring first must show that Graham could be held liable for its allegedly anticompetitive conduct. *See*

*Chandler v. Phoenix Servs. LLC*, 1 F.4th 1013, 1014 (Fed. Cir. 2021). "Under the *Noerr–Pennington* doctrine," a party is "immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555–56 (2014). This doctrine generally immunizes patent prosecutions and enforcement efforts, even where they are unsuccessful. *See Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345–46 (Fed. Cir. 2014); *see also Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 478 (6th Cir. 2023); *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 937 F.3d 1359, 1364 (Fed. Cir. 2019). However, there are "limited exceptions." *Intell. Ventures*, 937 F.3d at 1364. Two are relevant here: *Walker Process* fraud and sham litigation. *See TransWeb*, 812 F.3d at 1311.

### 1.  **Walker Process** *Fraud Theory*

"In *Walker Process*, the Supreme Court held that a plaintiff could bring an action under § 2 of the Sherman Act based on the alleged maintenance and enforcement of a fraudulently-obtained patent." *TransWeb*, 812 F.3d at 1306; *see also Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 173–74 (1965). To proceed under *Walker Process*, a plaintiff must show "that 'the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced that patent with knowledge of the fraudulent procurement.'" *Chandler*, 1 F.4th at 1014 (quoting *TransWeb*, 812 F.3d at 1306). Asserting "the invalidity of the patent [i]s not sufficient; a showing of intentional fraud in its procurement [i]s required." *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012).

"After *Therasense,* the showing[s] required for proving inequitable conduct and . . . the fraud component of *Walker Process* liability may be nearly identical." *TransWeb*, 812 F.3d at 1307. Accordingly, on this issue, the parties rely on their arguments regarding the sufficiency of Ring's factual allegations. Graham argues that Ring has failed to adequately plead that Graham

failed to disclose prior art, that Graham concealed test results material to patentability, or that Denner's averments to the PTO were false. [DE 89-2 at 2317]. In response, Ring argues that it "has sufficiently pled fraud to sustain a *Walker Process* claim." [DE 107 at 2502]. Because as discussed above, Ring's allegations are sufficiently pleaded under Rule 9(b)'s heightened standard for allegations of fraud, under a *Walker Process* theory, Ring's antitrust counterclaim reaches the merits at this stage. *See TransWeb*, 812 F.3d at 1307.

### 2. *Sham Litigation and* **Handgards** *Theory*

"*Noerr-Pennington* immunity does not apply if a party brings an action, such as a patent infringement action, that is a 'mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Intell. Ventures*, 937 F.3d at 1368 (quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998)). "To prove that the instant action is a sham and the plaintiff is not entitled to immunity, the suit must be 'both *objectively* baseless and *subjectively* motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy.'" *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1292 (Fed. Cir. 2010) (quoting *Nobelpharma*, 141 F.3d at 1071) (emphases in original).

Count II of Ring's pleading cites *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282 (9th Cir. 1984) (*Handgards II*), a Ninth Circuit case widely recognized as an early patent law sham-litigation decision. [DE 74 at 4685]. Graham's motion to dismiss does not address this *Noerr-Pennington* exception—only *Walker Process* fraud. Ring argues that Graham's motion "ignores [a] *Handgards* antitrust claim for sham litigation." [DE 107 at 2501]. Graham's reply notes that Count II of Ring's pleading was clearly captioned as a counterclaim for "*Walker Process* Fraud" and further argues that Ring's pleading simply does not articulate the substance of a sham litigation theory. [DE 128 at 2780–82].

17

Ring could have pleaded its sham-litigation theory in a third and separate count beyond Count II, which Ring specifically captioned as a counterclaim for "*Walker Process* Fraud." [DE 74 at 4684]. Arguably, Ring should have done so. *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense."). Nonetheless, Count II does expressly arise from both Graham's alleged "fraud on the PTO" and "this lawsuit." [DE 74 at 4684]. Those allegations implicate a *Walker Process* theory and a sham litigation theory, respectively. Ultimately, Count II is an antitrust counterclaim; *Walker Process* fraud and sham litigation, while distinct, are only preliminary hurdles to reaching the merits of the counterclaim. *See Chandler*, 1 F.4th at 1014. The Court must construe the counterclaim in the light most favorable to Ring. *See United Food & Com. Workers*, 812 F.3d at 524. Therefore, the Court will recognize and consider Ring's sham litigation theory at this stage.

Ring's pleading alleges that Graham "brought this lawsuit[] even though it knew the [P]atent was invalid and unenforceable" and, consequently, that Ring "could . . . have no liability for infringement." [DE 74 at 4684]. The allegation continues that Graham "has engaged in predatory or uncompetitive conduct with a specific intent to illegally monopolize the relevant market." [*Id.*]. Thus, Ring has alleged that Graham "attempt[ed] to interfere directly with the business relationships of a competitor," *Intell. Ventures*, 937 F.3d at 1368, that Graham's suit is objectively baseless, and that Graham subjectively intended "to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy," *ERBE Elektromedizin GmbH*, 629 F.3d at 1292. Accordingly, at this stage, Ring's antitrust counterclaim reaches the merits under Ring's "sham litigation" theory as well as its *Walker Process* theory. *Cf. TransWeb*, 812 F.3d at 1306.

### 3.  *Monopolization and Attempted Monopolization*

Turning to the merits of Ring's antitrust claim, "Section 2 of the Sherman Act makes it unlawful to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . .'" *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 622 (6th Cir. 1999) (quoting 15 U.S.C. § 2). The elements of monopolization are "(1) the possession of monopoly power in a relevant market" and "(2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002); *see also United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). The elements of attempted monopolization are "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *TransWeb*, 812 F.3d at 1306 (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)).

#### i.  *Defining the Market*

To show actual or attempted monopolization, a claimant first must "define the market within which the defendant engaged in the challenged conduct." *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011); *see also Conwood*, 290 F.3d at 782. Otherwise, "the anticompetitive effects of an improperly obtained patent are impossible to measure." *Delano*, 655 F.3d at 1351 (citing *Walker Process*, 382 U.S. at 177). "The relevant market is defined by both a product market and a geographic market." *TransWeb*, 812 F.3d at 1307. Here, Graham argues that Ring has failed to define the market [DE 89-2 at 2318–19] and complains that "Ring has failed to put Graham on notice of the market it is accused of monopolizing" [DE 128 at 2783].

"The relevant product market consists of all products that are reasonably interchangeable by consumers for the same purposes. 'Reasonable interchangeability' may be determined by looking at price, use, and qualities of the products." *TransWeb*, 812 F.3d at 1307 (cleaned up). Graham argues that Ring's pleading only implies something about "metal and glass containers" and "makes additional vague reference to the 'U.S. ketchup market.'" [DE 89-2 at 2320–21]. The pleading is much clearer than that. As Ring expressly pleads, "the relevant product market is the market for polyethylene terephthalate ('PET') containers with active oxygen barriers used for sensitive food and drink products, where the containers may be used without aging to allow for simplified inventory management ('PET containers for oxygen-sensitive consumables'). . . . A relevant submarket is PET containers for ketchup." [DE 74 at 4685]. Ring's response brief is correct that the pleading "defines both a relevant product market and a relevant submarket, each of which independently meet the plausibility standard." [DE 107 at 2503].

"The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks. Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *TransWeb*, 812 F.3d at 1308 (cleaned up). On this point, Graham argues that Ring "makes additional vague reference to the 'U.S. ketchup market,' but does not explain whether it considers this to be the relevant market . . . ." [DE 89-2 at 2321]. On this point as well, the pleading itself is clear. Ring pleads that Graham's conduct "harms customers in the United States who will be forced to pay more for products serving the relevant market." [DE 74 at 4693]. The section of the pleading which sets out "the relevant market" also twice addresses the domestic "ketchup market." [*Id.* at 4687]. Furthermore, as Ring notes in its

response, "the scope of the patent at issue is the United States." [DE 107 at 2506]. Ring has adequately pleaded that the relevant geographic market is the United States.

It is ultimately Ring's burden to establish the relevant markets. *See Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 n.3 (6th Cir. 2005). But "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Id.* (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)). Here, Ring's allegations regarding the product and geographic markets are sufficient for the pleadings stage.

### ii. *Monopoly Power*

Ring also must show that Graham has either monopoly power or a dangerous probability of achieving monopoly power. *See Conwood*, 290 F.3d at 782; *see also TransWeb*, 812 F.3d at 1306. "Monopoly power consists of 'the power to control prices or exclude competition.'" *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986) (quoting *Grinnell*, 384 U.S. at 571). "An attempted monopolization [under § 2] occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition." *Conwood*, 290 F.3d at 782 (quoting *Smith v. N. Michigan Hosps., Inc.*, 703 F.2d 942, 954 (6th Cir. 1983) (alteration in original)).

"Because a true determination of whether a firm possesses monopoly power hinges upon an analysis of complicated economic factors, courts often look to market share as a proxy for monopoly power." *Am. Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 622. "[C]ourts have been quick to find monopoly power where the market share is 75–80% or greater," though "this should be regarded as a starting point." *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979) (footnote omitted). An alleged 70% market share has been considered sufficient to survive a motion to dismiss. *See White Mule Co. v. ATC Leasing Co. LLC*, 540 F.

Supp. 2d 869, 885–86 (N.D. Ohio 2008). As for attempted monopolization, "there are dozens of cases stating that market shares of 50% are 'generally' sufficient . . . and much lower market shares may support such a claim when there are strong barriers to entry." *Dodge Data & Analytics LLC v. iSqFt, Inc.*, 183 F. Supp. 3d 855, 869 (S.D. Ohio 2016).

Graham argues that Ring has failed to plausibly allege monopoly power. [DE 89-2 at 2322]. Ring's pleading, which cites Graham's own damages calculations, alleges that Graham has "an 88% share of the ketchup market" and "at least 50%" of the market for PET containers for oxygen-sensitive consumables." [DE 74 at 4688]. The pleading also sets out several particular "barriers to entry" for the relevant market. [*Id.* at 4686–87]. At this stage, these allegations are enough to overcome Graham's motion to dismiss. *See White Mule*, 540 F. Supp. 2d at 885–86; *Dodge Data & Analytics*, 183 F. Supp. 3d at 869.

### iii. *Antitrust Standing*

An antitrust claimant must show both that it has suffered harm and that it is "a proper party to bring a private antitrust action." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983); *see also Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000). In deciding "whether a claimant has adequately pleaded antitrust standing," courts balance several factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012), *aff'd*, 572 U.S. 118 (2014) (quoting *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)).

Here, the parties take different approaches to standing. Citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007), Graham argues that Ring lacks antitrust standing and has failed to adequately plead harm to the relevant market. [DE 89-2 at 2324–31]. According to Graham, Ring's pleading makes only "'naked assertions' relating to purported 'competition-reducing' harm" and fails to connect Ring's claimed injuries to anticompetitive behavior. [*Id.* at 2327–28]. Meanwhile, Ring's argument focuses on *patent* antitrust decisions, specifically. [DE 107 at 2509–12]. Ring argues that a party sued for patent infringement has standing to bring counterclaims for *Walker Process* fraud and sham litigation under *Handgards*. [*Id.* at 2509–10].

Notably, Ring's antitrust allegations face the ordinary pleading standard in Rule 8(a), not the heightened threshold of Rule 9(b). *See Twombly*, 550 U.S. at 569 n.14. In other words, Ring's pleading need only provide a "short and plain statement" of "a claim to relief that is plausible on its face." *Id.* at 555, 570. Ring pleads that Graham, by its complaint and claims in this lawsuit, ████ ████████████████████████████████████████████████████ and to "to sow doubt" about Ring's "continued ability to supply customers." [DE 74 at 4691–92]. Ring also pleads that Graham's conduct has injured both Ring and other market participants. [*Id.* at 4692–93]. Regarding itself, specifically, Ring pleads two direct injuries: ███████████████████████ and its attorney's fees in this litigation. [*Id.* at 4689, 4692]. As for the broader group of Graham's competitors, Ring pleads that Graham's actions ████████████████ and "also threaten to suppress superior technology." [*Id.* at 4689]. Reviewing these allegations for the factors articulated in *Southaven Land*, the Court is satisfied that Ring has pleaded more than mere "consequential harm." *See NicSand*, 507 F.3d at 449 (quoting *Associated Gen. Contractors of California*, 459 U.S. at 545). Because Ring has adequately pleaded antitrust injury and is a proper party for prosecuting this case's antitrust counterclaim, Count II survives Graham's motion to dismiss.

23

### C. Ring's Invalidity Counterclaim

The parties appear to agree that Count I of Ring's pleading, captioned as a counterclaim for "declaratory judgment," primarily challenges the Patent's validity. [DE 89-2 at 2331; DE 107 at 2512]. Graham argues that Count I is "nothing more than a threadbare legal conclusion" that "should be dismissed." [DE 89-2 at 2331]. Ring responds that "Count I is supported by detailed prior averments . . . ." [DE 107 at 2512]. Declaratory judgment is "a form of relief, not a cause of action." *Weiner v. Klais & Co.*, 108 F.3d 86, 92 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002). "The Declaratory Judgment Act, 28 U.S.C. § 2201 . . . does not create an independent cause of action." *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). But Ring may seek and is seeking declaratory relief in this case. Because the substance of Ring's pleading survives Graham's motion to dismiss, there is no reason to dismiss Count I. *E.g. Acrisure, LLC v. Hudak*, 618 F. Supp. 3d 642, 650–51 (W.D. Mich. 2022); *McKinnie v. State Farm Fire & Cas. Co.*, 298 F. Supp. 3d 1138, 1149 (M.D. Tenn. 2018).

### IV. CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that Graham's motion to dismiss Ring's counterclaims and to strike Ring's tenth defense [DE 89-2] is **DENIED**.

March 31, 2025

Rebecca Grady Jennings, District Judge
United States District Court