UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

GRAHAM PACKAGING COMPANY, L.P.                    Plaintiff/Counter-Defendant

v.                                               Case No. 3:23-cv-110-RGJ-RSE

RING CONTAINER TECHNOLOGIES, LLC                  Defendant/Counter-Claimant

* * * * *

**MEMORANDUM OPINION & ORDER**

Before the Court are several motions to exclude expert opinions filed by the parties, Plaintiff and Counter-Defendant Graham Packaging Company, L.P. ("Graham") and Defendant and Counter-Claimant Ring Container Technologies, LLC ("Ring"). Graham moves to exclude all or portions of the expert testimony of David Hricik ("Hricik") [DE 275; DE 318; DE 348;], Robert Stoll ("Stoll") [DE 287; DE 289; DE 312; DE 339], and John Scalf ("Scalf") [DE 293; DE 321; DE 349]. Ring moves to exclude all or portions of the expert testimony of John Floros and Thomas McGahee ("Floros" and "McGahee") [DE 278; DE 280; DE 306; DE 336], Jeffrey Kinrich ("Kinrich") [DE 282; DE 285; DE 315; DE 345], and Robert Kimmel ("Kimmel") [DE 290; DE 292; DE 309; DE 342]. A *Daubert* hearing was held on Graham's motion to exclude Scalf [DE 293] on May 12, 2026. [DE 463]. After the hearing, the parties submitted briefing regarding the disclosure requirements under Rule 26(a)(2)(E) and potential sanctions under Rule 37(a). [DE 458; DE 465; DE 469]. Briefing on these motions is complete and these matters are ripe. For the following reasons, Graham's motion to exclude Hricik [DE 275] is **GRANTED in part and DENIED in part**, Ring's motion to exclude certain of Stoll's opinions [DE 287] is **GRANTED**, Graham's motion to exclude Scalf [DE 293] is **GRANTED in part and DENIED in part**, Ring's motions to exclude testimony of Floros and McGahee [DE 278], and Kinrich [DE 282] are

**DENIED as moot**, and Ring's motion to exclude testimony of Kimmel [DE 290] is **GRANTED in part and DENIED in part**.

The following motions for leave to seal are **GRANTED**: [DE 308, DE 310, DE 313, DE 316, DE 319, DE 322, DE 337, DE 340, DE 343, DE 346, DE 350, DE 466].

## I. BACKGROUND

### A.  The Parties

Graham is a Delaware limited partnership headquartered in Pennsylvania. [DE 1 at 3]. The company describes itself as "a leader in the design, manufacture, and sale of innovative food, beverage, household, and automotive containers." [*Id.* at 1]. Relevant here, Graham provides customers in the food and beverage industry with containers for oxygen-sensitive products. [*Id.*]. Ring is a limited liability company organized and headquartered in Tennessee. [DE 1 at 4; DE 74 at 4651]. Like Graham, Ring provides containers for customers in the food and beverage industry. [DE 74 at 4651]. The parties are competitors. [*Id.* at 4689].

### B.  The '809 Patent

Since 2022, Graham has owned U.S. Patent No. 11,345,809 ("the Patent"), entitled *Oxygen Scavenging Compositions Requiring No Induction Period*. [DE 1-1]. According to Graham, historically, food and beverage manufacturers have needed to store empty product containers for days or weeks before filling them; this "induction period" is generally necessary "to allow beneficial oxygen scavenging characteristics of the packaging material to become active." [DE 1 at 2]. Graham's patented invention produces "a container that . . . provides oxygen scavenging characteristics without the need for costly and logistically disruptive induction periods." [*Id.*]. One

key aspect of the invention is a polyethylene terephthalate ("PET") layer "that is substantially free of antimony."[1] [*Id.* at 6; *see also* DE 1-1 at 35].

The record indicates that Graham first applied for the Patent in 2014. [DE 1-1 at 16, 25]. According to Ring, Graham initially "sought broad[] claims to a composition," but the composition was rejected as obvious, meaning it would have been readily apparent to a person of ordinary skill in the relevant field. [DE 74 at 4660–61]; *accord* 35 U.S.C. § 103. The patent prosecution that ultimately resulted in the Patent at issue here took seven years. [DE 74 at 4660].

By early 2021, Ring alleges Graham was "increasingly concerned that [Ring's] accused products had achieved industry recognition for key innovations." [*Id.* at 4678]. Graham learned that Ring's technology both was "superior for recyclability" and showed good oxygen scavenging efficiency. [*Id.* at 4678–79]. A key customer considered leaving Graham for Ring. [*Id.* at 4679]. Graham was aware of this and knew that its business was at risk. [*Id.*].

In late 2021 and early 2022, Graham submitted to the U.S. Patent and Trademark Office ("USPTO") declarations by employee John Denner ("Denner"). [*Id.* at 4661–63]. In his first declaration, Denner "swore that . . . 'all known commercial monolayer scavengers at the time required an aging period prior to filling.'" [*Id.* at 4661]. He claimed that high antimony was to blame and that Graham had both kept and gained customers thanks to its "antimony free PET scavenger material." [*Id.* at 4661–62]. But the PTO still rejected Graham's claims and arguments. [*Id.* at 4662]. Denner's second declaration "aimed to make the claims 'commensurate in scope' with [Graham's] arguments concerning commercial success and the problem solved." [*Id.* at 4662–63]. Thereafter, the PTO allowed the Patent, which issued on May 31, 2022. [*Id.* at 4663].

---

[1] According to the Patent, antimony (Sb) is a commonly used catalyst in PET bottle production. [DE 1-1 at 31–32]. "[B]y maintaining a sufficiently low concentration of antimony," the patented invention forms a bottle "without any significant induction period." [*Id.* at 26]. While there are other ways to reduce induction periods, those methods can cause recyclability issues and other problems. [*Id.* at 25].

### C. The Claims

Graham initiated this action on May 8, 2023. In the Complaint, Graham accuses Ring of willfully infringing the '809 Patent through the sale of bottles made with its BarrierGuard® OxygenSmart™ formulation (the "Accused Product"). [DE 1 at ¶ 20]. Graham alleges in its Complaint that Ring has "engaged in knowing and willful infringement of the '809 Patent" since the '809 Patent was issued, "or at the very least since February 8, 2023," when Graham demanded by certified mail that Ring "cease the manufacture and sale of [the Accused Product]." [*Id.* at ¶¶ 45, 47]. Specifically, Graham's expert contends that the Accused Product infringes claims 1–4, 6–9, 13–14, 17–18, 20, and 33 of the '809 Patent ("the Asserted Claims"). [See DE 299-1 ("Expert Report of Robert Kimmel dated July 30, 2025")].

In its Answer, Ring maintains that Ring did not infringe Graham's patent. [DE 74 at 4651, 4655–56]. Ring also asserts an affirmative defense: "inequitable conduct and unclean hands," rendering the Patent "unenforceable." [*Id.* at 4657–58]. Ring alleges that Denner and the inventors of the '809 Patent, Murali K. Akkapeddi ("Akkapeddi") and Brian A. Lynch ("Lynch"), failed to disclose material prior art, as well as "testing results and/or other information inconsistent with representations in the patent application and arguments advanced in prosecution," and that Denner "made material and false representations to the [USPTO] in his declarations in order to obtain allowance of the '809 patent." [*Id.* at 4657].

Additionally, Ring asserts two counterclaims. The first seeks a declaratory judgment that the Patent is "invalid and/or unenforceable." [*Id.* at 4683]. The second is an antitrust counterclaim under Section 2 of the Sherman Act for "actual or attempted monopolization." [*Id.* at 4684]. Ring claims that Graham has injured Ring and other market participants by, among other things, "threaten[ing] to suppress superior technology" and "sow[ing] doubt" about Ring's "continued ability to supply customers." [*Id.* at 4689, 4692]. As noted in this Court's prior Order, Ring's

4

antirust claim may proceed under either a "*Walker Process* fraud" or "sham litigation" theory. [DE 219 at 5172].

## II. STANDARD

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>       (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>       (b) the testimony is based on sufficient facts or data;
>       (c) the testimony is the product of reliable principles and methods; and
>       (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (holding *Daubert* analysis applies to expert testimony based on "technical" or "specialized knowledge").

> Under Rule 702 of the Federal Rules of Evidence, "a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable."

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting

*Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise.  *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at * 33 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").  Further,

> the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact."

*Mannino v. International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with expert qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597). To assist with this determination, the Supreme Court in *Daubert* laid out several factors[2] for the courts to consider.  *Daubert*, 509 U.S. at 592–594. Courts have "stressed, however, that *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . In some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (citation and internal quotation marks omitted) (finding that the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions

---

[2] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho*, 526 U.S. at 149–50 (quoting *Daubert*, 509 U.S. at 592–594).

formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation"). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* (alteration in original) (quoting *Kumho Tire Co.,* 526 U.S. at 153).

Decisions as to the admissibility of expert testimony are reviewed subject to the abuse-of-discretion standard. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir.2001).

## II. DISCUSSION

### A. USPTO Experts

Ring and Graham have each submitted expert reports on patent law and the USPTO, primarily relating to Ring's inequitable conduct allegations.

#### 1. Hricik

According to Ring, Hricik is "a leading expert on [USPTO] practice and procedures." [DE 318 at 11852]. Regarding his qualifications, Ring states that

> Hricik has been a professor of patent law and legal ethics for 20 years, he has over 30 years of experience in advising patent prosecutors and others on the legal and ethical obligations of practicing before the USPTO, and he has written and lectured widely on USPTO practice and procedures. Indeed, the USPTO itself has recognized Mr. Hricik's expertise, with the USPTO's Office of Enrollment and Discipline having engaged Mr. Hricik as an expert in a disciplinary proceeding involving compliance with the rules governing USPTO practice.

[*Id.*].

Ring served two expert reports from Hricik: (1) a July 30, 2025 Confidential Opening Expert Report of Professor David Hricik [DE 277-1 (filed under seal, hereinafter "Hricik Report A")] and (2) a September 26, 2025 Confidential Supplemental Opening Expert Report of Professor David Hricik [DE 277-2 (filed under seal, hereinafter "Hricik Report B")].

Hricik Report A summarizes patent prosecution considerations and procedures relevant to Ring's inequitable conduct defense, including a summary of USPTO procedure, and his understanding of the relevant legal issues. [DE 318 at 11853]. Hricik then "summarizes his understanding of the facts, including his understanding of the technology, the available prior art and evidence . . . and a summary of the prosecution history of the application that led to the '809 Patent." [*Id.* (citations omitted); *see also* DE 275-1 at 5612]. Hricik opines on the materiality of the prior art available to Akkapeddi, Lynch, Denner, and Graham when prosecuting the '809 Patent and certain alleged misrepresentations to the patent examiner.

In his report, Hricik identifies several categories of prior art omitted by Graham that were "but-for material" to the USPTO's decision to issue the '809 Patent:

> First, there were various commercial Indorama materials that consisted of Indorama's OxyClear materials and the recipes it publicly and widely promoted to Graham and others for making bottles. . . . Another category of but-for material prior art that Graham knew about but did not disclose are the Schmitz and Leuschner patents disclosing Indorama's commercial recipes. . . . Moreover, Mr. Hricik explains that the blinded data Mr. Denner provided to support claims . . . did not support Mr. Denner's sworn statements at all because the underlying data 'included low antimony examples with poor oxygen performance and high antimony examples with good oxygen performance.'

[DE 318 at 11853–55 (citing DE 277-1 ¶¶ 99–252, 264)]. Lastly, Hricik opines that " " and did not disclose to the USPTO that the '809 Patent application " [DE 277-1 ¶¶ 293–95].

### 2. *Stoll*

To rebut Hricik's opinions, Graham proffers the report of Stoll, a former Commissioner of the USPTO. Relevant to Ring's motion to exclude [DE 587], a portion of Stoll's rebuttal report

opines that, when prosecuting the '809 patent, neither Akkapeddi, Lynch, Denner, or Graham possessed an intent to deceive the USPTO. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ This testimony is presented in Section VII.E of the Stoll Report, entitled "Absence of Evidence Supporting an Intent to Deceive." ▮▮▮▮▮▮▮▮

### 3. Graham's motion to exclude opinions of Hricik [DE 275]

#### i. Testimony Regarding USPTO Procedure

Courts routinely hold that "[e]xpert testimony regarding general procedures of the patent application process may be helpful to a jury and is therefore admissible." *Nisus Corp. v. Perma-Chink Sys., Inc.*, No. 3:03-CV-120, 2005 WL 6112992, at *4 (E.D. Tenn. May 27, 2005) (citing *Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.*, 79 F. Supp. 2d 252, 256 (W.D.N.Y. 2000) ("Obviously PTO procedures are foreign to the average person, and it may be helpful to the jury to hear someone experienced in those procedures explain how they operate in terms that a layperson can understand.")).

Graham argues that Hricik "never worked at the Patent Office or as a patent attorney," and thus he lacks the "lacks the specialized knowledge to help the jury understand evidence relating to the patent application process." [DE 275 at 5616]. Ring agrees that Hricik has "never drafted a patent application, responded to an Office Action during prosecution, or submitted an information disclosure statement to the PTO," [*id.* at 5617–18], but contends that Hricik's academic training provided him with the requisite "specialized knowledge" to opine on USPTO procedure under Rule 702. [DE 318 at 11860].

As an initial matter, Ring is correct that Rule 702's "specialized knowledge" requirement need not be satisfied by "practical experience" alone, but may be established by "academic training and credentials" as well. *See Shire Viropharma Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *3 (D. Del. Mar. 31, 2021) (citation modified). Thus, an expert will not be excluded

"simply because [the court] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes, Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). The focus, instead, is on whether the qualifications that an expert does have provide a foundation for the witness to testify meaningfully on a given matter. *See Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, 669 F. Supp. 2d 514, 522 (M.D. Pa. 2009) (citing *Rose v. Truck Ctrs., Inc.*, 611 F. Supp. 2d 745, 749 (N.D. Ohio 2009)) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.") (quoting *Berry*, 25 F.3d at 1351). The fact that Hricik lacks the same practical experience as Stoll does not mean that Hricik is *per se* unqualified.

As Graham observes, however, it is also true that in the vast majority of cases cited by Ring where experts have been permitted to opine on USPTO policy and procedure, those cases "involved patent-law experts having many years of experience as practicing patent attorneys and/or as employees of the Patent Office." [DE 348 at 14219]. Moreover, many of the decisions cited by Ring were made in the context of a bench trial. Graham argues these cases are distinguishable because, as other courts have noted, "[t]he *Daubert* test . . . was intended to protect *juries* from being swayed by dubious scientific testimony." [DE 348 at 14220 (emphasis in original) (quoting *Deere & Co. v. Kinze Mfg., Inc.*, No. 4:20-cv-00389-RGE-HCA, 2024 WL 1235569, at *3 (S.D. Iowa Feb. 8, 2024) ("When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate."))]. Thus, Graham argues, the Court should decline to follow *PACT XPP Schweiz AG v. Intel Corp*, No. 1:19-CV-01006-JDW, 2023 WL 12014818 (D. Del. Mar. 27, 2023), the only case Ring cites in which Hricik, or any other expert who has never practiced as either a patent attorney or a USPTO examiner, has been admitted to testify as

an expert on USPTO procedure. [*See* DE 348 at 14219 (explaining that in *PACT* "Hricik was proffered as an expert for a *bench* trial")].

In *PACT*, the court rejected similar arguments to those advanced by Graham in this case. Although the plaintiff argued Hricik was not a qualified expert on USPTO practices and procedures "because he isn't licensed to prosecute patents before the PTO and he never worked at the PTO," the court found that Hricik's "more than 20 years of experience teaching[,] . . . more than thirty years of experience as a practicing attorney specializing in patent litigation," and his experience advising practitioners before the USPTO's disciplinary body "constitute[d] a 'broad range of knowledge, skills, and training [that] qualify an expert' regarding [USPTO] practices and procedure." *PACT*, 2023 WL 12014818, at *1 (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)).

After careful consideration, the Court finds the reasoning of *PACT* persuasive and finds that Ring has demonstrated that Hricik possesses "knowledge of the subject matter . . . such that his opinion will likely assist the trier of fact in arriving at the truth." *Mannino v. International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981). First, the fact that *PACT* was a bench trial was irrelevant to the court's determination that Hricik was qualified to testify on USPTO policy and procedure. *See PACT*, 2023 WL 12014818, at *2 (explaining that inadmissible opinions regarding "legal opinions" and "the subjective intent of PACT's employees" need not be excluded at that time because the court could "sustain objections to those opinions at [the bench] trial").

Second, the Court agrees that Hricik's academic experience and other practical experience qualify him as an expert on USPTO policy and procedure. Hricik has substantial academic experience, including over two decades as a law professor teaching "patent law, patent litigation, [and] legal ethics," among other subjects. [DE 318 at 11861]. Although Graham attempts to limit

11

Hricik's expertise to "*ethics* issues relating to patent prosecution," [DE 348 at 14218], Graham ignores that Hricik was retained by the USPTO's Office of Enrollment and Discipline "as an expert, including for disciplinary proceeding involving compliance with USPTO Rules, guidance, and regulations," [DE 318 at 11862], and has "authored numerous articles on issues involving patent prosecution and USPTO practice and procedures." [*Id.*].

In so finding, the Court recognizes that few courts appear to have admitted experts without experience as a patent attorney or USPTO employee to opine on the "inner workings of the patent office." [DE 348 at 14218]. On the other hand, Graham cites no cases finding that an individual with Hricik's experience is unqualified under Rule 702 and the Court is unaware of any. It may be that the absence of practical experience provides for weaker testimony, which is why fewer law professors are called as USPTO experts. Indeed, Graham may choose to cross examine Hricik on his resume to the extent it is relevant to his testimony at trial. Hricik's lack of experience as a patent examiner or patent attorney himself goes to "the weight of the expert's testimony" and is an issue reserved "for the trier of fact." *Mannino*, 650 F.2d at 851.

ii.    Testimony Regarding Materiality, Cumulativeness, and Inventorship

Next, Graham contends that Hricik "lacks the technical expertise" necessary to offer his opinion on "materiality," "cumulativeness," and "inventorship." [DE 275 at 5618, 5621, 5622]. It is undisputed that Hricik is not personally familiar with the technology in this case and not capable of providing testimony from the viewpoint of a person of ordinary skill in the art ("POSITA"). However, Ring asserts that there is no requirement that Hricik be a POSITA in this case because his opinion either is based on the perspective of the USPTO or, to the extent technical knowledge is required, relies exclusively on the opinions of Ring's technical expert.

12

### a. Materiality

Under *Therasense, Inc. v. Becton, Dickinson & Co.*, to succeed on its inequitable conduct claim Ring must show that Graham withheld information from the USPTO that was "but-for material." 649 F.3d 1276, 1291 (Fed. Cir. 2011). "When an applicant fails to disclose prior art to the [USPTO], that prior art is but-for material if the [USPTO] would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* To satisfy this materiality prong at trial, Ring intends to offer Hricik's opinion that Graham omitted material prior art references when prosecuting the '809 patent—namely the Indorama materials [DE 277-1 ¶¶ 202–224], the Leuschner Patent and Schmitz Publication [*id.* ¶¶ 241–253], the testing data contradicting Denner's statements to the USPTO [*id.* ¶¶ 254–292], and Graham's alleged ████████████████████ [*id.* ¶¶ 293–298].

Graham claims that Hricik's opinions on whether these alleged omissions were material must be excluded under *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008). According to Graham, determining materiality requires Hricik to offer an opinion on whether the prior art would have rendered the patent invalid, which *Sundance* says may only be done by a witness "qualified as an expert in the pertinent art." *Id.* at 1363. [*See* DE 275-1 at 5619 ("In fact, the Federal Circuit has made clear that determining but-for materiality of a reference constitutes a validity analysis.") (citing *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017))].

Numerous courts have held, consistent with *Sundance*, that USPTO experts may not testify on the issue of materiality of omitted prior art because such determinations require knowledge of the underlying technical aspects of the prior art. *See, e.g., Ojmar US, LLC v. Sec. People, Inc.*, No. 16-CV-04948-HSG, 2018 WL 3008872, at *3 (N.D. Cal. June 15, 2018) ("The issues here are

13

*what* the patent examiner would have found if she had Defendants' prior patent before her, and *why* she would have made that finding."); [*see also* DE 275-1 at 5620 (collecting cases)]. And, relevant here, one of the few courts in this circuit to have addressed this issue considered competing expert testimony from the same USPTO experts in this case. *See Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, No. 1:12-CV-654, 2016 WL 4239181, at \*4 (W.D. Mich. Jan. 29, 2016) (limiting Hricik's and Stoll's testimony to the subject of "Patent Office practice and procedure").

However, Ring points to other courts which have distinguished *Sundance* in the context of inequitable conduct inquiry on the basis that the relevant analysis is from the perspective of the USPTO rather than a POSITA. *See, e.g. Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:11-CV-492-RWS-KNM, 2017 WL 4173468, at \*3 (E.D. Tex. Sept. 21, 2017) ("Defendants' reliance on *Sundance* is misplaced because the challenged opinions in *Sundance* concerned technical issues such as infringement and invalidity, not materiality"); *Aevoe Corp. v. AE Tech Co.*, 2014 WL 4182343, at \*2 (D. Nev. Aug. 20, 2014) ("In contrast to inquiries into infringement and validity, the materiality prong of the inequitable conduct inquiry is analyzed from the perspective of the [USPTO] . . . . Accordingly, an appropriate expert on this topic could be an individual who has knowledge of and experience with the procedures of the [USPTO]."); *see also Nisus Corp. v. Perma-Chink Sys., Inc.*, No. 3:03-CV-120, 2005 WL 6112992, at \*5 (E.D. Tenn. May 27, 2005) (finding, pre-*Sundance¸* that USPTO expert "may be qualified to testify, at least to some extent, on the issue of materiality").

Even in Delaware, where district courts "take a strong and consistent view with respect to the admittance of the testimony of 'patent law experts[,]'" *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. CV 11-515, 2015 WL 12815314, at \*3 (D. Del. Nov. 20, 2015), courts appear split on

14

whether and to what extent a USPTO expert may testify regarding the materiality prong. *Compare Persawvere, Inc. v. Milwaukee Elec. Tool Corp.*, No. 21-400-GBW, 2023 WL 8019085, \*14-\*15 (D. Del. Nov. 20, 2023) (allowing accused infringer's expert, a former PTO ALJ, to testify as to the materiality of alleged withheld information from the PTO and whether statements made to the PTO were materially false), *with W.L. Gore & Assocs., Inc.*, 2015 WL 12815314, at \*5 (excluding "opinions from a legal expert about what the facts of the record 'indicate' to him about materiality, intent, and what the examiner would have done had circumstances been different'"). In sum, courts are divided on whether and to what extent USPTO experts may offer testimony on the materiality prong of an inequitable conduct claim.[3]

After reviewing the case law and the parties' arguments, the Court is persuaded that *Sundance* does not control where, as here, the issue does not call for the perspective of a POSITA. *See Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017) ("Determining but-for materiality requires that the court *place itself in the shoes of a patent examiner* and determine whether, had the reference(s) been before the examiner at the time, the claims of the patent would have still issued.").

Having already found that Hricik is qualified as a USPTO expert, the Court finds that Hricik's testimony should not be excluded to extent it is helpful in placing the trier of fact "in the shoes of a patent examiner," including by explaining what a patent examiner would consider material, based on USPTO practices and the facts in the record. *See Holmes Grp., Inc. v. RPS Prods., Inc.*, No. CIV.A. 03-40146-FDS, 2010 WL 7867756, at \*5 (D. Mass. June 25, 2010)

---

[3] In contrast, as discussed *infra* Section II.A.3.iv, the vast majority of courts hold that experts may not opine on whether the patentee had the intent to mislead or deceive the USPTO, although some courts hold that an expert may testify as to circumstances from which the finder of fact could infer such intent. *See Network-1*, 2017 WL 4173468, at \*5 ("On balance, the case law establishes that although an expert may point to and even testify about evidence relevant to intent, he may not speculate about a party's intent.")

(finding expert's testimony "as to how patent practitioners generally interact with the patent office" and testimony "explain[ing] the patenting process. . . would be potentially helpful to the trier of fact" when assessing materiality). Consistent with the holding in *Shire Viropharma Inc*, Hricik may opine that certain prior art references are material from the perspective of the USPTO, and in doing so may rely on the technical opinions of Moore and his own reading of the documents before the USPTO. 2021 WL 1227097, at *31 (permitting Stoll to opine whether prior art was, "from the perspective of the PTO, a material reference"); *see also Se-Kure Controls, Inc. v. Vanguard Prods. Grp., Inc.*, 2008 WL 169054, at *3 (N.D. Ill. Jan. 17, 2008) (permitting USPTO expert "to provide some factual context for why . . . behavior may have been inequitable, but only in the narrow context that he is able to testify as to the materiality of the relevant prior art."). Hricik's opinions should not "stray[] beyond such testimony into more technical areas," such as expressing views on the accuracy of Moore's opinions. *See Shire,* 2021 WL 1227097, at *31 (permitting similar testimony from Stoll). Graham may, of course, address Hricik's lack of technical knowledge and experience as a USPTO examiner on cross-examination.

### b.  *Cumulativeness*

Cumulativeness is subsumed within the materiality inquiry because "prior art is not but-for material if it is merely cumulative." *California Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022). A reference is cumulative when it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997); *accord Regeneron Pharms., Inc.*, 864 F.3d at 1350.

Because this issue also calls for the perspective of the USPTO, Hricik will be permitted to opine on whether a USPTO examiner would consider the alleged omitted prior art references cumulative to the prior art already identified in the '809 Patent application.

### c. Inventorship

Inventorship is a legal conclusion premised on underlying factual findings and claim construction and must be determined on a claim-by-claim basis. *Egenera, Inc v. Cisco Sys., Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020); *see also Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994) ("Conception, and consequently inventorship, are questions of law. . . ."). Proper inventorship is a requirement of patentability. *Cubist Pharms., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 673 (D. Del. 2014), *aff'd*, 805 F.3d 1112 (Fed. Cir. 2015).

Graham is therefore correct that Hricik may not offer opinions on the inventorship of the claims in the '809 patent because "experts cannot offer testimony on legal conclusions.*" Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, No. 3:13-cv-82-CRS, 2019 WL 1435934, at *3 (W.D. Ky. Mar. 29, 2019) (citations omitted).

Hricik may, however, provide his opinion as a USPTO expert regarding whether undisclosed information relevant to inventorship was but-for material. For instance, relying on Moore's conclusion "████████████████████████████████████████████████ ███████████████████████████████████████," Hricik opines that had the Indorama Materials been disclosed, ██████████████████████████████████████████████████ ██████████████████" [DE 277-1 ¶¶ 221, 224]. And Hricik's opinion is based on his knowledge of USPTO policy and procedure, as governed by statute: ████████████████████████ ██████████████████████████████████████████████████████████████

██████████████████████████████████████████ " and thus "inventorship is always material to patentability." [*Id.* ¶¶ 24, 220].

   iii.  Testimony Regarding the Prosecution History of the '809 Patent

  Graham contends that Hricik's summary of the prosecution history of the '809 Patent is an improper subject for expert testimony and, further, that the "proposed testimony regarding the patent prosecution history is inextricably intertwined with his *spin* on the factual events." [DE 275-1 at 5624 (emphasis added)]. Ring replies that Hricik's testimony on this subject will be helpful for the trier of fact and necessary because none of the named inventors of the '809 Patent will be available to testify at trial.

  "'[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.'" *Shall v. Suzuki Motor of Am., Inc.*, No. 4:14-CV-00074-JHM, 2020 WL 1162193, at *5 (W.D. Ky. Mar. 10, 2020) (citing *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009)); *Highland Cap. Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). To the extent such evidence is admissible, it is "properly presented through percipient witnesses and documentary evidence." *Id.* (citing *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015)). "However, as opposed to providing a mere factual narrative, [an] expert is allowed to articulate the 'factual underpinning' upon which [he or she] bases [his or her] opinion." *Id.* (quoting *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *12 (N.D. Ga. Feb. 25, 2019)).

  When patent law experts proffer factual summaries of patent prosecution histories, "such testimony is sometimes admitted and sometimes excluded." *W.L. Gore & Assocs., Inc.*, 2015 WL 12815314, at *4 (admitting testimony where expert's "case-specific summary of what was filed when in context with [expert's] discussion of general PTO procedures that relate to such filings"

18

would be helpful to inequitable conduct inquiry). *Cf. Brigham & Women's Hosp. Inc. v. Teva Phams. USA, Inc.*, 2010 WL 3907490, at \*2 (D. Del. Sept. 21, 2010) ("[T]he law in [the District of Delaware] is clear that experts may not . . . explain patent prosecution histories through expert testimony . . . ."). A review of caselaw teaches that when courts have admitted similar testimony they have done so primarily because there were no fact witnesses available to testify as to the relevant prosecution history. *See, e.g., Shire*, 2021 WL 1227097, at \*19 ("In the absence of any fact witness who can present these file histories, [the USPTO Expert's] narration of this background, prosecution history, and *inter partes* review proceedings will serve to advance the trial.").

Graham states that "if inequitable conduct is an issue that remains for trial after summary judgment, Ring will call at least Mr. Denner to testify as a fact witness with personal knowledge of the prosecution history of the asserted patent." [DE 348 at 14229]. And to the extent Denner's testimony is not enough, Ring may also rely on the deposition testimony of Akkapeddi and Lynch.

Nevertheless, the Court will not exclude Section E of Hricik's report in its entirety. Given the lengthy prosecution history of the '809 Patent and the fact that certain fact witnesses will be unavailable for trial, Hricik's testimony may be necessary or at least helpful. Ring is cautioned, however, that the Court will not permit a lengthy factual narrative or testimony cumulative to the testimony of fact witnesses. *See Island Intellectual Prop. LLC v. Deutsche Bank AG*, 2012 WL 526722, at \*2 (S.D.N.Y. Feb. 14, 2012) ("No proposed expert will be allowed to act as a vehicle for lengthy factual narrative . . . . This Court will not allow a proposed expert to walk the jury through a . . . timeline of the patent prosecution events . . . about which he has no personal knowledge, simply because his testimony represents the easiest way to do that."). Nor will the Court permit Hricik to summarize deposition testimony or other record evidence produced during

19

discovery in this case in order to opine on what the inventors and Denner "knew" while prosecuting the '809 the Patent. [*See, e.g.*, DE 277-1 ¶ 118 ████████████████████████████ ████████████████████████████████████████████████ ████████████████████ ")].

Additionally, the Court will exclude Hricik from summarizing Graham's litigation conduct and pre-suit investigation in Section E of his report. Such matters are beyond Hricik's expertise on USPTO policy and procedure and appear to be nothing more than disguised attorney argument.

iv.    Testimony Regarding Patent Law, Legal Conclusions, and Intent

Lastly, Graham asserts that Hricik invades the province of the court and the jury by opining on the law and by applying the law to assumed facts. [DE 275 at 5626–31]. In particular, Graham notes that: "Hricik spends nearly 80 paragraphs of his report doing little to nothing more than explaining background law" [*id.* at 5626]; Hricik intends to offer conclusions regarding materiality, invalidity, and whether Graham breached its duty of candor or duty of disclosure [*id.* at 5628]; and Hricik's testimony concerns the mental state of the USPTO examiner and "as to the inventors', Mr. Denner's, and Graham's intent." [*Id.* at 5629].

*Se-Kure Controls, Inc. v. Vanguard Prods. Grp., Inc.*, 2008 WL 169054 (N.D. Ill. Jan. 17, 2008), is instructive. Much like in this case, the USPTO expert's "report describe[d] the United States Patent System, procedure within the PTO, and how [the plaintiff] allegedly intentionally withheld material prior art, thereby rendering [patents-in-suit] unenfor[c]eable." *Id.* at *2. The court found opinions "as to whether the [patent-in-suit] is enforceable, whether [plaintiff] committed inequitable conduct, or as to the level of intent behind any alleged failures to disclose prior art," were all inadmissible. *Id.* at *3. The court explained,

[i]t is a basic principle that the duty of the district court is to explain the law. Testimony by a witness, therefore, is limited to opinions based on facts, but may

20

not include legal conclusions. Mr. Gerstman's statements that he expects to testify about Se-Kure's failure to comply with its duty of disclosure, resulting in equitable conduct, is simply inadmissable. Mr. Gerstman is also not a mind-reader. He may not testify that he knows Se-Kure's intent to hide certain information nor may he testify that he knows Se-Kure lied about certain information. Also inadmissible are Mr. Gerstman's long explanations of rules and legal definitions.

*Id.* On the other hand, the Court found certain of the expert's opinions admissible:

Mr. Gerstman is permitted to testify about general procedures involved in the patent application process and the operations and functions of the PTO. This type of testimony can be helpful to the fact-finder. . . . Mr. Gerstman is also likely able to provide some factual context for why Se-Kure's behavior may have been inequitable, but only in the narrow context that he is able to testify as to the materiality of the relevant prior art. If Mr. Gerstman can shed light on what a reasonable examiner would have considered important, his testimony is admissible.

*Id.*

The Court will exclude Hricik's lengthy discussions of patent law except to the extent they inform his testimony on "general procedures involved in the patent application process and the operations and functions of the [US]PTO." [*Id.*]. Hricik may not opine as to legal conclusions such as whether Graham or its agents engaged in inequitable conduct or whether they violated their duty of candor or duty of disclosure. Nor may Hricik opine as to the state of mind of Graham or its agents, including what they "knew" or believed prior art taught at the time of prosecuting the '809 Patent.[4] *Cf. id.* (precluding expert from offering legal conclusions or opining regarding the knowledge of individuals before the USPTO).

However, as discussed above, Hricik may provide factual context based on his expertise on the USPTO that will be helpful for the jury in assessing the materiality prong of Ring's

---

[4] This includes the portions of paragraphs 118–119, 153 n.8, 183, 190, 207–209, 215–217, 224, 242, 263, 295, 298, 302, and 307–308 of Hricik's report, to the extent Hricik opines on what certain individuals knew or believed. [*See, e.g.,* Hricik Report A ¶ 216 ("The inventors, at least, knew that knowledge/understanding was known by those skilled in the art.")].

21

inequitable conduct claim. This testimony primarily concerns (1) summary of relevant USPTO rules and procedures, including what a USPTO examiner takes into consideration when evaluating prior art; and (2) opinions regarding what a USPTO examiner would have considered material and why.

Accordingly, Graham's motion to exclude Hricik is **GRANTED in part and DENIED in part**, consistent with this opinion.

### 4. *Ring's motion to exclude opinions of Stoll [DE 287]*

Ring requests that the Court exclude Stoll from offering testimony related to the intent of Akkapeddi, Lynch, Denner, and Graham when prosecuting the '809 Patent. [DE 287]. Graham responds that Stoll's opinions are necessary to rebut Hricik's testimony on the same issues of intent, which Ring intends to offer in support of "its allegations regarding what Graham's inventors knew and Ring's assertions that they 'misled the Patent Office.'" [DE 312 at 115231]. However, Graham represents that it will not present such rebuttal testimony at trial if Hricik's testimony is excluded. [*Id.* at 115229].

As discussed above, Hricik's testimony regarding the intent of Graham or its agents is excluded. This includes the opinions on what individuals "knew," contained in the paragraphs of Hricik's report cited in Graham's response in opposition to Ring's motion. [*See id.* at 11530 (identifying "paragraphs 118–119, 153 n.8, 183, 190, 207–209, 215–217, 224, 242, 263, 295, 298, 302, and 307–308 of Hricik's report").].

Accordingly, because the Court has excluded Hricik's testimony opining on what certain individuals knew or speculating as to their intent, the Court will similarly **GRANT** Ring's motion to exclude Stoll's opinions on intent.

22

### B.  Economic, Industry, and Damages Experts

Both parties intend to offer expert testimony relevant to Ring's antitrust counterclaim for actual or attempted monopolization, which requires Ring to "define the market within which [Ring] engaged in the challenged conduct." *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1351 (Fed. Cir. 2011). Additionally, Ring must show that Graham has either monopoly power or a dangerous probability of achieving monopoly power. *See Conwood*, 290 F.3d at 782.

#### 1.  *Scalf*

According to Ring, "Scalf is a Yale-trained economist who has addressed a number of economic issues in antitrust matters." [DE 278 at 5903]. Ring retained Scalf to define the relevant product market, establish Graham's alleged monopoly power within that market, and calculate Ring's requested damages resulting from its antitrust claim. [DE 293-1 at 7255; *see also* DE 295-1 ¶ 6 ( "Scalf Report," filed under seal)].

Relevant here, Scalf's report identifies the relevant market as one for " ███████ ███████ " in the ███████ , defined by ketchup manufacturer's district preferences, including " ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ " [DE 295-1 ¶¶ 32-34]. Scalf identified the relevant market by applying the "Hypothetical Monopolist Test" (HMT) and by reference to "practical indicia of a distinct market," as set forth in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) and its progeny. [*See* DE 295-1 ¶¶ 32–72].

Under the HMT, a factfinder identifies a candidate product market and asks whether a hypothetical monopolist controlling that market could impose a "small but significant non-transitory increase in price" ("SSNIP")—generally defined as a five to ten percent increase in price

23

imposed over at least three years—and still turn a profit. [DE 293-1 at 7256]. If enough customers would switch to substitutes in the face of a SSNIP such that the SSNIP would be unprofitable, then the factfinder must gradually expand his market definition until it encompasses both the candidate product and the reasonable substitutes to which customers would turn if the candidate product became more expensive. [*Id.* at 7257]. *Accord Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 5:11-cv-1755, 2015 WL 6082122, at *8 (N.D. Ohio, Sept. 30, 2015)]. The HMT is also used to identify the relevant geographic market. *See Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 890 (W.D. Ky. 2020) ("Generally, to define a relevant market, economists employ the hypothetical-monopolist test."). Rather than ask whether customers would turn to other products, the inquiry is whether customers would leave the candidate geographic market in the face of a SSNIP. If so, the market definition must be expanded. *Id.*

Applying the HMT, Scalf determined that " ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [DE 295-1 at 7352]. Scalf then found practical indicia supporting that PET ketchup bottles were a well-defined antitrust product based on ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████"

[*Id.*].

Lastly, Scalf found that Graham had market power in the market for PET ketchup bottles and that Ring had suffered damages from Graham's exclusionary conduct. [*Id.* at 7354]. Specifically, Scalf estimates that " ███████████████████████████████████████

24

███████████████████████████████████████████ in addition to other associated costs.

[*Id.* ¶ 150].

### 2. *Floros and McGahee*

To rebut the testimony of Scalf regarding the relevant market definition and Graham's

alleged monopoly power, Graham seeks to introduce the opinions of Floros and McGahee. [*See*

DE 306 at 10893]. Floros is a "professor of food science, packaging, and engineering who regularly

consults with food manufacturers concerning their food packaging needs." [*Id.*]. McGahee is an

economist who "specialize[s] in the interpretation of economic and financial data—including in

antitrust and intellectual property matters." [*Id.* at 10806 n.6]. Graham offers Floros' testimony

"as an expert in the area of food and science packaging" "regarding the relevant market for the

antitrust violations alleged in Ring's Counterclaims . . . including the participants and competitors

in such market, the products in such market, and considerations by purchasers in such market."

[DE 280-1 ¶ 15 ("Floros Report," filed under seal)]. McGahee's export report rebuts Scalf's market

definition, his assessment of Graham's alleged monopoly power, and the alleged harmful effects

Scalf asserts resulted from the monopoly. [*See generally* DE 280-4 ("McGahee Report," filed

under seal)].

### 3. *Kinrich*

To rebut Scalf's opinions regarding Ring's antitrust counterclaims and the damages

associated therewith, Graham offers the expert rebuttal report of Kinrich. [DE 285-1 ("Kinrich

Report," filed under seal)]. Kinrich is a Certified Public Accountant ("CPA") and, according to

Graham, "is a damages expert with over 40 years of experience analyzing financial and economic

issues in patent cases and other commercial disputes." [DE 315 at 11808]. The Kinrich Report

opines on (1) causation between Graham's alleged anticompetitive conduct and Ring's alleged

harm, (2) Ring's alleged failure to mitigate, and (3) Scalf's damages calculation. [*See* DE 282 at 6236; DE 315 at 11809].

### 4. *Graham's motion to exclude opinions of Scalf [DE 293]*

Graham requests that the Court exclude the entirety of Scalf's opinions and testimony for several reasons.

#### i.    <u>Whether Scalf is qualified</u>

First, Graham contends that Scalf "has no specialized knowledge about the food or packaging industry and . . . he is not skilled in the art of the '809 Patent," and therefore his testimony will not help the trier of fact in evaluating the relevant market, Graham's market power, or the resulting alleged damages. [DE 293-1 at 7259].

##### a.    *Opinions regarding the food-packaging industry*

According to Graham, "Scalf purports to serve as a hybrid expert providing at least two types of opinion: (1) whether current customers, based on preferences unique to their industry, would switch to other products in the face of a SSNIP (as a food-packaging expert), and (2) if so, whether they would switch in sufficient numbers to render the SSNIP unprofitable for a hypothetical monopolist (as an economist)." [*Id.* at 7260]. Although Graham does not contest Scalf's qualifications as an economist, it asserts he should not be allowed to opine on how bottle customers would react to a SSNIP, bottle manufacturing, or the food or condiment industries, because he lacks expertise in the bottle or packaging industries. [*Id.* (citing *Hill v. Med. Device Bus. Servs., Inc.*, No. 24-5797, 2025 WL 1950300, at *5–6 (6th Cir. July 16, 2025) (affirming exclusion of opinion on surgical procedures where expert had no "medical training or familiarity with the instruments used during [plaintiff's] surgeries")).]

In response, Ring maintains that "economists are not required to have experience in a particular industry to be qualified as testifying experts." [DE 321 at 11928 (citing *Faughn v.*

*Upright, Inc.*, No. 5:03-CV-000237-TBR, 2007 WL 854259, at \*4 (W.D. Ky. Mar. 15, 2007))].

And Scalf's opinions "are based on extensive evidence about consumer preferences from sources with experience in the industry and relevant knowledge"—in particular, Scalf's interviews with five Ring witnesses with "extensive experience in either bottle engineering, food packaging, and/or sales of bottles/food packaging." [*Id.* at 11929].

As discussed above, the Sixth Circuit has instructed that district courts should give a broad interpretation to the term "expert." *Mannino*, 650 F.2d at 849. The court should only consider "whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id.* at 851. Once that threshold requirement is met, any lack of experience or familiarity with a particular area of the industry goes to the weight of the testimony, not admissibility. *See Am. Honda Motor Co., Inc.*, 151 F.3d at 516.

*Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077-JHM, 2020 WL 6331092 (W.D. Ky. Oct. 28, 2020), is instructive. In *Morris*, the defendant moved to exclude the opinions of the economics expert on the basis that they had "no knowledge, skill, experience, training, or education in the poultry industry." *Id.* at \*2. The court disagreed, finding the expert's "significant experience in economics" made them qualified to opine on whether the defendant's "action adversely affected competition and to assess Plaintiffs' damages." *Id.* Even though some industry specific facts and data the expert relied on to reach his economic opinions fell "outside the scope of his expertise," the court held that cross-examination was "the appropriate time to address those weaknesses." *Id.*

Similarly, here, the fact that Scalf does not have any experience specific to the food-packaging industry does not disqualify him as an expert. Scalf holds considerable academic qualifications. [DE 321 at 112928 ("Scalf has a B.S. in Applied Mathematics and Economics from

27

Yale and an MBA and PhD in Economics from the University of Chicago.")]. And "[h]e has twenty years of experience as an economist and has served as an expert in over 23 antitrust investigations/litigations." [*Id.*]. Scalf's experience as an economist, particularly in the context of antitrust matters, qualifies him to opine on industry preferences to the extent they provide necessary background for his economic analysis.

Notably, the majority of cases relied on by Graham considered whether the expert's opinion was reliable, not whether the expert was qualified by knowledge, skill, experience, training, or education. Unlike those cases, where the expert "offer[ed] no explanation" for her conclusion, *Hill*, 2025 WL 1950300, at *5, or "unreliably applied unreliable methods to insufficient and even irrelevant data," *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 770 (6th Cir. 2025), Scalf's bases for opining on industry preferences are clear. In addition to interviews with Ring witnesses, Scalf relied on "documents and testimony from KHC and Conagra (ketchup makers), as well as Graham, Ring, and Amcor (bottle suppliers), about both the preferences of ketchup manufacturers who buy bottles, and the ultimate consumers who buy ketchup, making their preferences important to ketchup manufacturers." [*Id.* (citing DE 295-1 at 7426, Ex. 2].

The same is true regarding Scalf's opinions "as to whether a SSNIP would be profitable." [DE 293-1 at 7261]. Contrary to Graham's assertion that Scalf "did not perform any economic analysis," Scalf's conclusions that an SSNIP would be profitable in the ketchup PET market were far from unfounded. [*Id.*] Indeed, Scalf relied on the same sort of evidence Graham claims was required, including "[c]ustomer reaction to historical price changes" and customer testimony. [*Id.*, Ex. C]. For example, Scalf estimated the price history of PET ketchup bottles using proxies—such as the cost of PET resin—and concluded that despite significant price increases ketchup manufacturers were not induced into substitute products such as glass or other plastics. [*See* DE

28

295-1 ¶¶ 57-60 ("This lack of a consumer response to large changes in price further confirms that a hypothetical monopolist of PET ketchup bottles could profitably raise the price of PET ketchup bottles by more than a SSNIP without fear of these customers switching in large numbers.")]. And, as discussed above, Scalf relied on documents and testimony from customers. [*See, e.g., id.* ¶ 45 (citing deposition of Robert Knieper, "███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████."); *id.* (██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████)].

In sum, Graham's contention that Scalf is not an industry expert is not a basis to exclude his opinions, although it may be a subject for cross-examination. *See Jones v. Varsity Brands, LLC*, No. 2:20-cv02892-SHL-tmp, 2024 WL 844952 (W.D. Tenn. Feb. 28, 2024) (holding economist's relevant market should not be excluded when supported by citations to relevant documents from the record that provided a reasonable factual basis and that noting that "challenges to the documents relied on can be addressed on cross-examination"); *see also Morris*, 2020 WL 6331092, at *2 ("To the extent there are weaknesses in Siegert's qualifications to testify about a[n industry] topic related to monopsony power and damages, cross-examination is the appropriate time to address those weaknesses."); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (affirming the district court's decision to allow an economics expert to testify on damages related to real estate fraud, even though the expert had no specific real estate experience).

### b.  *Opinions regarding anticompetitive behavior*

Graham also argues that because Scalf is not an expert in patent law and lacks knowledge of the '809 Patent, he cannot "assess the impact Graham's patent has on the relevant antitrust

29

market" or "distinguish between products that Graham has and has not accused of infringement in this case." [DE 293-1 at 7262]. Without patent law expertise, Graham explains, Scalf cannot assess whether the '809 Patent conferred monopoly power to Graham, or "disaggregate the portion of his ultimate damages figure that could be attributable to [Graham's] *procompetitive conduct*." [*Id.* (alterations in original, quoting *Marathon Petrol. Co. LP*, 464 F. Supp. 3d at 894 – 95)].

Scalf's opinions are not excludable on the basis that he is not a patent law expert. First, Graham cites no cases holding that an expert witness must have specialized knowledge of patent law to opine on whether an alleged fraudulent assertion of a patent amounted to anticompetitive conduct or on the amount of damages associated therewith. Second, Graham fails to identify any portions of Scalf's report which require such specialized knowledge.[5] Indeed, the only portion of Scalf's report that Graham cites is Scalf's understanding of *Ring*'s allegations in this case, i.e., that Graham ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [DE 295 at 7325]. To the extent Graham's argument relies on the holding in *Marathon Petrol. Co. LP*, 464 F. Supp. 3d at 893–895, that case addresses the reliability of the damages expert's methodology, not whether the expert had "specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

ii.    Whether Scalf's opinions are based on sufficient facts or data

Graham next argues that Scalf's opinions are not based on "sufficient facts or data" as required by Rule 702(b) because Scalf limited his review to Graham and Ring's sales data [DE 293-1 at 7262, 63], ignored sales of other "active-barrier PET bottles" to customers other than ketchup manufactures [*id.* at 7264–67], and arbitrarily narrowed his product market definition based on end use—in this case, to bottle ketchup for "retail sale" [*id.* at 7267–69].

---

[5] Graham's objections to the reliability of Scalf's methodology are discussed below, so the Court does not address them here.

However, "[w]hen the *selection* of certain data in an expert's analysis is challenged, but the expert provides a rationale supported by the record, the issue of whether the expert's conclusions are accurate or defensible goes to the weight of the evidence, not its admissibility." *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 5:11-CV-1755, 2015 WL 6082122, at *6 (N.D. Ohio Sept. 30, 2015) (emphasis added). Thus, even assuming Scalf did ignore certain sales as Graham claims, the question is whether Scalf had a reasonable basis for doing so.

Central to each of Graham's arguments is Scalf's definition of the relevant product market is, or what Graham refers to as the market for the "Candidate Bottles." [*See, e.g.*, DE 293-1 at 7263]. For instance, Graham claims that Scalf cannot determine a myriad of information critical to the HMT due to his alleged failure to "determin[e] the universe of suppliers who currently sell the Candidate Bottle." [*Id.*]. But Scalf's decision to focus on Ring and Graham's sales data was because he determined they were "███████████████████████████████████ ██████████████." [DE 295-2 at 7580]. Whether this decision was reasonable depends, in part, on Scalf's definition of "PET ketchup bottles." [*Id.*].

In his report, Scalf defines the relevant market as one for PET ketchup bottles, "███████ ████████████████████████████████████" [DE 295-1 ¶ 9]. However, Graham explains that Scalf clarified at his deposition that "PET ketchup bottles" is shorthand for ████████ ████████████████████████████████," and refers to ████████ ████████████████████████████████████████████ ████████████████████████████████████████████" [DE 295 at 7321].

Graham is correct that Scalf's definition of PET ketchup bottles includes bottles sold to non-ketchup manufacturers, which would nevertheless be suitable for ketchup manufacturers. To the extent Ring claims that "[t]he candidate product here is an active oxygen-barrier bottle sold to

31

bottle ketchup" [DE 321 at 11939], that argument is unpersuasive because Ring concedes that Scalf's "report and deposition make clear that [] Scalf's definition is based *solely on bottle attributes, not downstream use*." [*id.* at 11939 n.10; *see also id.* ("Scalf expressly testified that the market is defined by the characteristics of the bottles, '*not the end use*.'")].

In sum, Scalf's report and deposition testimony are clear that "PET ketchup bottles," the candidate product to which he applied the HMT, refers to bottles (1) made with PET resin; and (2) which

> possess several features that ketchup manufacturers prefer, including lightness, durability, squeezability, clarity (to allow customers to see the product), and an active oxygen barrier that helps preserve product freshness and extend shelf life.

[DE 295-1 at 7351].

The Court now turns to Graham's first contentions: whether Scalf erred by only analyzing the sales data of Ring and Graham. [DE 295 at 7326 (claiming Scalf "██████████████

████████████████████████████████████████

████") (quoting *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 962 (6th Cir. 2004)). Graham contends that without analyzing the sales data of Ring and Graham's competitors, Scalf cannot know "the total number of Candidate Bottles a hypothetical monopolist would sell. . . [,] the baseline amount of profit attributable to those sales, or what a reasonable SSNIP would be in light of the prices charged by the parties." [*Id.*]. These arguments are unpersuasive. First, unlike the expert in *Worldwide Basketball & Sport Tours, Inc.,* Scalf *did* "look at those in competition with [Ring] (their "competitors"), the competitors' output, or their output relative to [Ring]." 388 F.3d at 962. Scalf analyzed the sales data of Ring's primary competitor, Graham. Scalf also "considered data from suppliers other than Ring and Graham, including, for example, sales data produced by Plastipak, as well as industry data covering all

32

sales." [DE 321 11932 n.5 (citing Scalf Rep. ¶¶ 36, 57)]. Second, as discussed further below, Scalf's focus on the sales data of Ring and Graham was based on his determination that Ring and Graham are "███████████" manufacturers of PET ketchup bottles. [DE 295-2 at 7580]. And this determination is not unreasonable in light of his finding that █████████████████████████ ████████████████████████████████████████████ [DE 295-1 ¶ 71]. Accordingly, the Court will not exclude Scalf's opinion on this basis.

Next, the Court considers whether Scalf erred by ignoring sales of PET ketchup bottles to non-ketchup customers. [DE 295 at 7327 (claiming "ketchup constitutes only a small sliver of the entire market for active-barrier PET bottles like Graham and Ring's")].[6] Graham claims that by focusing solely on sales by Graham and Ring, who sell mostly to ketchup manufacturers, "Scalf did not consider how *most* customers of clear, squeezable, active-barrier PET bottles would react to a SSNIP placed on those bottles." [DE 349 at 14239].

During his deposition, Scalf explained that his reasoning for doing so was that Ring and Graham are "███████████" manufacturers of the candidate product and "███████████ ████████████████████████" [DE 295-2 at 7580–81]. He further explained that he was not interested in the sales activity of companies that sold the candidate product to non-ketchup manufacturers because most of the customers for PET ketchup bottles are ketchup manufacturers. [*Id.* ████████████████████████████████████████████████ ███████████████████████████████████████████)].

---

[6] "[B]ecause Scalf does not know who those competitors' sell their products to," Graham also asserts that "he cannot determine the preferences of those customers, how many of those customers would switch to a different product in the face of a SSNIP, what products those customers would consider to be reasonable substitutes, or whether the resulting loss of profits would be enough to render the SSNIP unprofitable." [*Id.*].

The Court is satisfied that Scalf's rationale is supported by the record and thus not inadmissible on this basis. *See Universal Surveillance Corp.*, 2015 WL 6082122, at \*6. As discussed above, Scalf based his assumptions regarding end use on sales data from Graham and Ring as well as interviews with Ring's witnesses. For example, relying on documents produced in discovery, "Exhibit 4" to Scalf's Report reflects that "████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████" [DE 295-1 at 7373 (████████████████████)]. And among types of food that are packaged in active-barrier PET, Scalf determined that ketchup manufacturers had distinct preferences which make "PET ketchup bottles" ideal for bottling ketchup but not for other foods typically packaged in active-barrier PET bottles, and vice-versa. [*See id.* at 7371–72].

Graham's next contention is that Scalf arbitrarily limited his analysis to PET ketchup bottles sold "for retail sale" and thus improperly narrowed the product market to a limited group of customers. Graham is correct that a party bringing antitrust claims may not "narrow a relevant product market to a select group of customers without identifying a difference in the product supplied to that group of customers." *Smith v. Multi-Flow Dispensers, Inc.*, 181 F.3d 103, 1999 WL 357784, at \*5 (6th Cir. 1999) (unpublished table decision) (rejecting product market alleged in complaint where there was no basis for concluding that the product offered to "taverns and locally owned restaurants" differed from the product used by "non-locally owned" restaurants).

However, the Court does not find that Scalf narrowed his definition of the product market by end use here, "for retail sale" or otherwise. Rather, Scalf's analysis considered end-use to the extent it was relevant to determine customer preferences. [*See* DE 295-2 at 7632 ("My opinion focuses on the customers of the PET ketchup bottles themselves, not necessarily on the end use.

Of course, the end use is going to influence the demands of the upstream manufacturers of ketchup.")]. To the extent Graham believes Scalf's demand-side substitution analysis improperly weighs the preference of retail consumers of ketchup and/or the preferences of ketchup manufacturers, that is an issue for cross-examination. *See, e.g., Parks v. Kia Motors Am., Inc.*, No. 23-5654, 2024 WL 4024667, at *7 (6th Cir. Sept. 3, 2024) (explaining "Defendants would have the opportunity to discredit [expert's] conclusion on cross-examination; however, because [expert] based his testimony on admissible facts in the record and the results of his own testing," the opinions were admissible).

Likewise, Graham's contention that "Scalf's substitutability analysis is facially wrong, given the existence of interchangeable no-barrier PET bottles and non-PET bottles already being sold to customers within his product market" is a subject for cross-examination, but not a proper basis for exclusion. [DE 293-1 at 7269]. As noted by Ring, the record is contested on whether ketchup manufacturers have switched in certain instances to PET bottles without active barriers or to non-PET bottles such as "HDPE bottles". [*Compare* DE 293-1 at 7269 ("Red Gold . . . decided to switch to no barrier ketchup bottles nearly two years ago), DE 295 at 7333 (pointing to fact that some ketchup manufacturers already use HDPE bottles), *with* DE 321 at 11937 (citing evidence showing Red Gold has not switched to no-barrier PET); DE 295-1 at 7370–71 (citing parties' 30(b)(6) witnesses who were unaware of any substitution in ketchup industry for no-barrier PET or HDPE bottles)]. And even though the record shows that non-ketchup manufacturers regularly substitute with no-barrier PET bottles [DE 295 at 7333], Scalf cites to substantial evidence showing that ketchup manufacturers have a strong preference against such substitution. [*See, e.g.,* DE 295-1 at 7369 (citing evidence of preference for oxygen barrier from Conagra, Red Gold, and Kraft Heinz).

Such contested factual assertions are not bases for exclusion. *See Parks*, 2024 WL 4024667, at *10 (reversing exclusion; "merely because an expert bases a conclusion on a disputed fact does not render the conclusion unreliable"); *Sierra Enters. Inc. v. SWO & ISM, LLC*, 264 F. Supp. 3d 826, 836 (W.D. Ky. 2017) ("Expert testimony will not be excluded because a party alleges a factual dispute."); Fed. R. Evid. 702 (2000 & 2023 Advisory Committee notes).

iii.    Whether Scalf applied reliable principles and methodologies to determine the relevant market

Graham assigns three errors to Scalf's application of the HMT. First, Scalf chose ketchup bottles as the candidate product market on which to perform the HMT, rather than defining the product market by the asserted '809 Patent, which would encompass a broader market. Second, Scalf failed to calculate the potential effect of a SSNIP on his candidate market, including by failing to calculate pricing and profits. Third, Scalf applied the HMT and the *Brown Shoe* practical indicia as two "independent analyses," in contravention of the Sixth Circuit's holding in *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983) (holding district court "fundamentally erred by construing the market test and the submarket criteria as independent, substitute standards").

"[A] plaintiff charging an antitrust violation will want the relevant market to be narrowed as much as possible, thereby enlarging the alleged monopolist's share as much as possible." *Multi-Flow Dispensers of Ohio, Inc.*, 1999 WL 357784, at *1; *accord Belfiore v. New York Times Co.*, 654 F. Supp. 842, 846 (D. Conn. 1986), aff'd, 826 F.2d 177 (2d Cir. 1987) ("Obviously, the narrower the market defined by plaintiffs, the easier it is to show possession of monopoly power in the relevant market."). Courts have excluded expert testimony premised on the expert's "own version" of the HMT SSNIP test "produced solely" for litigation. *See, e.g., Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009).

> *a. Scalf's decision to use PET ketchup bottles as the candidate product*

Graham contends that by choosing PET ketchup bottles as the candidate product for his market analyses, and focusing his analysis almost exclusively on ketchup customers, Scalf's methodology is unreliable. While, "courts routinely reject attempts to manufacture a market definition so as to encompass only that group of products or customers where the defendant purportedly 'excludes competition,'" [DE 293-1 at 7271], none of the cases cited by Graham support excluding an expert's opinion merely because they began with a narrow definition of the candidate product. Indeed, that is what the hypothetical monopolist test requires. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021) ("[A]n economist proposes a narrow geographic and product market definition and then iteratively expands that definition[.]"). The market definitions in the cases cited by Graham failed not because the proponent chose a narrow definition that would benefit their claims, but because the proponent "failed to provide a factual basis sufficient to justify its delineation of the relevant market." *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1034 (N.D. Ill. 2003), *aff'd*, 354 F.3d 661 (7th Cir. 2004); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) ("Regardless of the substance of the proffered customer definition or the method by which it was arrived at, PepsiCo has not proffered sufficient evidence from which a factfinder could conclude that the customer base should be viewed so narrowly.").

Here, Graham fails to explain why "PET ketchup bottles" was an inappropriate starting point for Scalf's analysis. Graham states that the candidate product should have been based on Graham's assertions in the '809 Patent. In response, Ring points to statements made by Denner during the prosecution of the '809 Patent that "[r]egarding market share, *the primary market for*

37

*the containers of the invention is the ketchup market*" and that Graham "was able to secure an 88% total share of the ketchup market." [DE 321 at 11936 (emphasis added)]. Scalf justified his decision to use PET ketchup bottles as the candidate product based on evidence in the record and as such was not improper.

> b. *Scalf's application of the HMT to determine relevant product market*

Next, Graham claims that Scalf incorrectly applied the HMT to his candidate product market. Crucially, Scalf did not "select a SSNIP" despite "████████████████████████ ████████████████████████████████" and, as a result, was unable to calculate what profits would result from a SSNIP. [DE 295 at 7335]. Scalf therefore lacked a reasonable basis to conclude that ketchup manufacturers would not switch to products other than PET ketchup bottles in sufficient numbers to render a SSNIP unprofitable.

Ring denies that Scalf was required to conduct the type of econometric analysis proposed by Graham. Rather, Scalf was entitled to rely on "historical data to look at how ketchup manufacturers actually responded to price increases at or higher than five percent." [DE 321 at 11931]. Ring explains that Scalf's HMT analysis relied on two historical data inquiries: (1) ketchup manufacturer's industry-wide purchases of bottles by material; and (2) the purchasing patterns of ketchup manufacturers relative to price proxies for PET ketchup bottles.

To the extent that Scalf's SSNIP analysis was based on historical data, Graham correctly observes that the price proxies Scalf used to identify SSNIPs applied to both PET ketchup bottles and its substitutes. [*See* DE 295 at 7338 ("Reviewing the price of *all* plastic bottles over time does not mimic a market in which a hypothetical monopolist increases *only* the price of clear, squeezable, active barrier PET bottles, since the price of possible substitutes like HDPE, no-barrier PET, and active barrier PET bottles made for other foods is also rising.")].

Ring's summary of Scalf's historical analysis highlights Graham's concerns. Even though Scalf's report distinguishes PET ketchup bottles from other active-barrier and no-barrier PET bottles, Scalf's historical analysis does not similarly distinguish between SSNIPs in PET ketchup bottles and other PET bottles. According to Ring,

> Scalf first examined Euromonitor data regarding 'ketchup manufacturer's industry-wide purchases of bottles by material—PET, glass, or other plastic—from 2013 to 2022. The data confirmed no meaningful substitution over that almost ten-year period, even though there were price fluctuations exceeding the normal SSNIP of 5%.

[DE 321 at 11932 (cleaned up)]. Accordingly, Scalf's analysis of Euromonitor data failed to consider whether ketchup manufacturers would substitute PET ketchup bottles with any other type of PET bottle. Next,

> Scalf then looked at 'price proxies' for PET ketchup bottles. Specifically, he looked at market prices for PET resin, the primary material used in PET ketchup bottles. . . . He evaluated historical fluctuations in resin price using the same PET resin price index used to price PET ketchup bottles in industry contracts and again found that there was no meaningful switching away from active-oxygen barrier PET bottles fluctuations far in excess of 5%. As yet another check on the market, [] Scalf examined a Producer Price Index data for plastic bottles and found no meaningful switching away, despite large changes in this index, which were sound proxies for the price of PET ketchup bottles.

[*Id.* at 11932–33 (cleaned up)]. At no point in Scalf's analysis of historical data does he consider whether, without a SSNIP in the cost of *all PET bottles*, a hypothetical monopolist could profitably impose a SSNIP on only PET ketchup bottles (as that term is defined by Scalf). At most, Scalf's analysis of historical data is reliable to show that ketchup manufacturers would not substitute in response to a SSNIP on PET bottles, generally. But even that showing is limited, because Scalf only reviewed what he considered to be price proxies for PET ketchup bottles. Scalf did not analyze whether during this period there were also SSNIPs on substitutes for PET ketchup bottles.

However, Scalf does not rely on historical data alone. He also examines potential substitute products for PET ketchup bottles and finds that ███████████████████████████ ████████████████████████████████████████." [DE 295-1 at 7351]. Scalf concludes that "███████████████████████████████████████████████████ ████████████████████████████████" and "█████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████." [*Id.* at 7368–72].

Additionally, Scalf points to other market evidence that there are no adequate substitutes. With respect to PET bottles without oxygen barriers, Scalf observes that

> no ketchup manufacturers in the U.S. have switched to PET containers without active oxygen barriers as a substitute for barrier-equipped containers . . . . This absence of observed switching, despite the availability of non-barrier PET containers in other applications, demonstrates that such containers do not serve as effective substitutes for PET containers with active oxygen barriers in the U.S. ketchup market.

[*Id.* at 7370]. And with respect to other PET bottles with oxygen barriers on the market, Scalf finds they are not viable substitutes because "many manufacturers of PET containers for juice, pasta sauce, and tea are vertically integrated and produce bottles exclusively for their own use" and that "many PET containers used for juice, tea, and pasta sauce are designed for hot-fill processes." [*Id.* at 7371].

Graham counters that Scalf's "forward-looking 'empirical' analysis is textbook *ipse dixit*." [DE 293-1 at 7273]. According to Graham, it was not enough for Scalf to "█████████████ ████████████████████████" and hypothesize "████████████████████████ ████████████████████████████████████████████." [DE 295 at 7336]. Rather, Scalf should have determined how many customers a SSNIP would induce to switch

products and have calculated "what the resulting loss of sales would be or whether that loss of sales would translate to a loss of profits outweighing a SSNIP." [*Id.*].

To be sure, as the foregoing discussion illustrates, Graham has identified several limitations to Scalf's report. Scalf's use of price proxies failed to isolate PET ketchup bottles, and his HMT analysis would be more compelling if he had estimated the lost volume of sales and change in profits. Instead, his market definition rests on his conclusion that there would be minimal or even zero switching activity away from PET ketchup bottles. Without calculating what number of lost sales would result, Scalf's opinion that ketchup manufacturers customers would not switch in numbers to render a SSNIP unprofitable may be afforded little weight by the trier of fact. Nevertheless, it is "based upon facts in the record, . . . not 'assumptions' or 'guesses,'" and so the Court will not exclude his testimony. *See also McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir.2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" (quoting *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993)) (internal citations omitted))); *Cooke,* 991 F.2d at 342 ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.").

Graham's reliance on *Kentucky v. Marathon Petroleum Co. LP* is misplaced because, unlike Scalf, the expert in that case provided "no explanation" for his market definition. 464 F. Supp. at 890. *DSM Desotech Inc. v. 3D Sys. Corp.* is no help either because in that case, "[r]ather than analyze economic data, [the plaintiff] and its expert relied on four of the *Brown Shoe* practical

41

indicia" and surveys from four of the plaintiff's customers. 749 F.3d 1332, 1342 (Fed. Cir. 2014). Regardless, the issue in *DSM Desotech Inc.* was whether summary judgment was appropriate— not whether the expert's testimony was admissible. *See* 749 F.3d at 1345 (finding "the district court did not err in granting summary judgment that Desotech failed to prove an independent market"). So too with *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) (affirming grant of summary judgment against plaintiff for lack of economic evidence).

Finally, Scalf's market definition is not excludable on the basis that he independently applied the *Brown Shoe* factors. [DE 293-1 at 7276 (asserting "Scalf impermissibly applied the Hypothetical Monopolist Test and the practical indicia as 'independent' analyses")]. In his report, Scalf discussed several practical indicia set forth in *Brown Shoe* which "███████████████████ ████████████████████████████████████████████ ████████████████████████████████" [DE 295-1 at 7375]. This approach is consistent with the purpose of submarket criteria "to be used in conjunction with the basic test to more precisely define the relevant markets." *Kentucky Speedway, LLC*, 588 F.3d at 918; *see also Worldwide Basketball & Sport Tours, Inc.*, 388 F.3d at 962 ("[A] submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to that test so as to more precisely define the market affected by the defendant's actions." (citations omitted)). Having first independently determined the relevant product market, it was not error for Scalf to further define the market by reference to the *Brown Shoe* factors. *See White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983) ("The final object of all market analysis is the identification of the relevant market; submarket criteria bring the most relevant market into sharper focus.").

### c.  *Opinions regarding geographic market*

Next, Graham contends that Scalf failed to apply the HMT—or any other reliable methodology—to determine the relevant geographic market, including by failing to investigate whether ketchup manufacturers "could turn to suppliers outside of the United States if a SSNIP is placed on products made within the United States." [DE 293-1 at 7277].

The "geographic market is defined as the region in which the seller operates, and to which the purchaser can practically turn for supplies." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014). "This process is fact intensive" and "include[s] considerations of areas where products are marketed, or where the defendant perceives that it is competing; any applicable regulatory standards; transportation costs and challenges such as risk of spoilage, size or weight; and other factors bearing upon where customers might realistically look to buy the product." *Id.* When the HMT is applied to define a geographic market, the candidate market is too narrowly defined if either (1) "buyers in a defined area would respond to a [SSNIP] by purchasing from another supplier, rendering the SSNIP unprofitable," or (2) "if additional suppliers would enter a market in response to one firm's price increase." *Id.* at 277–78.

Here, Scalf's analysis of the relevant geographic market is covered in three paragraphs in his expert report. [*See* DE 295-1 ¶¶ 81–82]. And Scalf admitted at his deposition that he "███████ ███████████████████████████████████████████████████████████████" because his other "█████████████████████████████████████████████████" [DE 295-2 at 7505]. The Scalf Report identifies the relevant considerations and concludes, that the relevant geographic market is the United States:

> To evaluate the geographic market for PET ketchup bottles, I consider the area in which a hypothetical monopolist of such bottles could profitably impose a SSNIP without customers switching to other suppliers. In defining the relevant geographic market for the supply of PET ketchup bottles, it is important to consider the options

available to buyers and the substitutability they perceive among different suppliers. Based on these factors, I conclude that the relevant geographic market is the United States.

[DE 295-1 ¶ 81]. Scalf asserts he limited the geographic market to suppliers within the United States because "buyers typically evaluate and choose among suppliers on a national basis," [*id.* ¶ 82], yet what buyers "typically" do does not address what they would do in response to a SSNIP on PET ketchup bottles. *See F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) ("This evidence must address where consumers could practicably go, not on where they actually go.").

Ring asserts that other evidence identified by Scalf in his report supports his geographic market. For example, Ring argues that "[r]ecord evidence confirms that ketchup manufacturers want bottles supplied near where they manufacture ketchup, in part to reduce freight costs." [DE 321 at 11945]. But while Scalf observes in his report that "the delivery of PET bottles necessarily occurs to local ketchup production facilities," Scalf explains that "buyers do not limit their supplier choices to firms with existing local facilities." [DE 295-1 ¶ 81 (explaining that Kraft Heinz considered Ring as a supplier . . . "despite Ring not having an existing plant nearby")]. Scalf doesn't address whether, like Ring, foreign suppliers would also be considered by ketchup manufacturers. To the extent Scalf discusses freight costs, Scalf's report never makes that finding in connection with his geographic market definition or addresses whether international freight costs would defeat a SSNIP.[7] Likewise, Scalf's findings that there are "differing consumer preference in the U.S., which lead to different bottle requirements in the U.S. market," including "longer shelf-life expectations," and Scalf's analysis of "other potential suppliers—those Graham

---

[7] The paragraph cited by Ring concerns the freight costs of glass ketchup bottles. [*See* DE 295-1 ¶ 36 (explaining "glass ketchup bottles are significantly heavier than lightweight PET ketchup bottles, resulting in higher transportation and distribution costs and greater environmental impact")].

identified as potential substitutes in its interrogatory responses" were all made in conjunction with his product market analysis. [DE 323 at 11984–85]. The question is what evidence Scalf did consider when applying the HMT test to determine the geographic market, not what evidence he could have considered. *See In re Human Tissue Prod. Liab. Litig.*, 582 F. Supp. 2d 644, 667 (D.N.J. 2008) ("[T]he arguments and extrapolations of counsel alone are not sufficient to prove the reliability of the expert's conclusions."). The report simply did not make clear what evidence was considered by Scalf in determining the geographic market.

Nor could the Court properly assess the admissibility of Scalf's opinions based on Scalf's deposition testimony. For instance, Scalf testified at his deposition he "assessed the geographies that [customers of PET ketchup bottles] could turn to in the face of a price increase, if they wanted to avoid that price increase," and concluded "they could turn to suppliers across the United States." [DE 295-2 at 7507]. But when asked whether he had "assess[ed] bottle makers who exist in, for example, Mexico and Canada," Scalf stated he had not. [*Id.* at 7510 (explaining that he had looked at "the historical record" of bottle suppliers and found "they're all U.S. companies")]. From Scalf's responses, it was not clear whether he had determined "if buyers in a defined area would respond to a [SSNIP] by purchasing from [an outside] supplier, rendering the SSNIP unprofitable." *See In re Se. Milk Antitrust Litig.*, 739 F.3d at 277–78 (explaining that HMT requires expanding the geographic market "until [enough] buyers in the relevant market respond to a SSNIP by purchasing regardless of the increase").

After reviewing Scalf's report and deposition testimony, the Court identified several concerns that could render Scalf's opinions inadmissible under Rule 702. For instance, the record was unclear whether Scalf reliably applied the HMT test to determine the relevant geographic

45

market or if, like the expert in *Kentucky Speedway¸* Scalf applied his "own version" of the test. 588 F.3d at 918.

In light of these concerns, the Court held a *Daubert* hearing on May 12, 2026. [DE 463]. During that hearing, Scalf described an analysis that was substantially more detailed than what was disclosed in his expert report and subsequently discussed at his deposition. Scalf stated that he had analyzed whether enough customers of PET ketchup bottles would switch to suppliers outside of the United States to render a SSNIP unprofitable by examining "four categories of qualitative evidence." [DE 463 at 29251–52.]. These categories were (1) product characteristics, (2) historical supply relationships, (3) bidding records, and (4) industry participant perspectives. [*Id. See also id.* at 29244 (stating he considered "past buyer responses, product characteristics, seller conduct, and views of industry experts")]. Scalf concluded that each category pointed "in the same direction of a geographic market defined as the United States." [*Id.* at 29282].

Despite the limited assertion of his opinions in Section E of his report (titled "The Geographic Market for PET Ketchup Bottles Is the United States"), Scalf stated at the hearing that the evidentiary bases for his geographic market opinions were disclosed in other sections of his report—such as Section C of his report (titled "Other Barriers or Technologies Identified by Graham Are Not Substitutes for PET Ketchup Bottles defining the product market"). [DE 295-1 at 7379; DE 463 at 29303]. When asked where he disclosed that his analysis of the product market was incorporated into his geographic market analysis, Scalf testified that this concept was conveyed by a catch-all phrase in paragraph 80 of his report identifying "the options available to buyers and the substitutability they perceive among different suppliers" as important factors to consider when "defining the relevant geographic market for the supply of PET ketchup bottles." [DE 295-1 at 7384; DE 463 at 29319–20].

Graham objects that this analysis was not adequately disclosed by Scalf's Report, as required by Rule 26, and must be excluded under Rule 37(c). [DE 458]. As discussed below, the Court agrees that Scalf's Report did not satisfy the disclosure requirements of Rule 26 and that exclusion is appropriate. Accordingly, the Court need not determine whether Scalf's methodology, as disclosed at the *Daubert* hearing, would satisfy Rule 702.

### d. Scalf's opinions on geographic market are excluded under Rule 37(c)(1)

Under Fed. R. Civ. P. 26(a)(2)(B) retained expert witnesses are required to produce a written report stating the opinions they intend to express, the basis for those opinions, the facts or data considered in forming them, and any exhibits that will be used to support them. The parties are under a continuing duty to supplement those expert reports in accordance with Rule 26(a)(2)(E). Fed. R. Civ. P. 26(a)(2)(E). Rule 37(c)(1) requires exclusion of witnesses and evidence not disclosed in accordance with Fed. R. Civ. P. 26(a) or (e) unless the party can show that the failure to timely disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

When an expert testifies at a deposition in conjunction with their report, the disclosure requirement "presents a more nuanced issue." *Crouch v. Honeywell Int'l, Inc.*, No. 3:07-CV-638-DJH, 2015 WL 13547448, at *5 (W.D. Ky. Nov. 19, 2015). Rule 26(b)(4)(A) permits the deposition of a person identified as an expert to be taken after the report has been served. Indeed, "[t]he reason for requiring that an expert report be provided before a deposition is taken is so the opposing party can use the report to examine the expert at the deposition." *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011). Additionally, the expert may expound on his or her opinions during the deposition. *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("The rule contemplates that the expert will supplement, elaborate upon, explain

47

and subject himself to cross-examination upon his report."). However, deposition testimony of an expert will not, as a general rule, cure a deficient expert report. *See Crouch,* 2015 WL 13547448, at *5 (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.")).

Ring argues that Scalf's geographic market analysis was disclosed in the report because it merely "built on" his product market analysis, both of which were contained in Section III of the report. [DE 465 at 29469].

After reviewing the report, however, the Court is unable to locate the analysis Scalf described at the *Daubert* hearing. While the Scalf Report does disclose that his analysis of geographic market employed the HMT test [DE 295-1 at 4384, ¶ 80 ("To evaluate the geographic market for PET ketchup bottles, I consider the area in which a hypothetical monopolist of such bottles could profitably impose a SSNIP without customers switching to other suppliers.")] and his conclusion that the geographic market is defined as a the United States [*id.*, ¶ 82], Scalf's report fails to identify the four categories of qualitative evidence discussed above as the bases for his opinions, or how the HMT was applied to the data to reach his geographic market conclusion. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The report must contain (i) a complete statement of all opinions the witness will express and the basis and reasons for them. . .") At the hearing he asserted that these four categories of evidence were discussed included in the other subsections of Section III, yet to the extent the Scalf Report addresses these qualitative factors it does so only with respect to his opinions regarding the relevant product market and Graham's market power, not geographic market.  While he may have relied on those other subsections, he does not indicate that in the Scalf

48

Report and at the hearing he substantially expanded on the analysis from those other sections and his reliance on those documents.[8]

For example, with respect to the first qualitative factor, product characteristics, Scalf explained that he relied on an internal ███████ document which showed that ketchup manufacturers outside the United States had removed oxygen barriers from their PET ketchup bottles in 2021 and 2022. [DE 463 at 29257 (referencing document bates stamped KHC0000039–062)]. When asked how this was relevant to his geographic market definition, Scalf stated it showed "the bottles that are produced for these foreign markets would not be acceptable substitutes for U.S. customers of PET ketchup bottles with active oxygen barriers. . . ." [*Id.* at 29260]. From this evidence, Scalf inferred that foreign bottle manufacturers currently manufacturing PET ketchup bottles would not be incentivized to manufacturer barrier PET bottles for which the only market would be the United States. [*Id.* at 29261–64 (explaining the incentives would be "highly reduced in these foreign markets because they don't have a domestic demand for an active oxygen barrier, so they would have to necessarily sell it to the U.S. market. And, of course, the foreign suppliers are going to be less competitive because you have to ship it all the way over to the U.S.")].

The disclosure problem with Scalf's analysis is twofold. First, in his report, Scalf only discusses this internal Kraft Heinz document in relation to his opinion that Ring held a competitive advantage over Graham with respect to ketchup manufacturers preference for recyclable bottles. [*See generally* DE 295-1 ¶¶ 100–101, 130–136]. This finding was used to support his opinions

---

[8] [*Cf.* DE 295-2 at 7506 (when asked whether there were "any other areas in the report where [Scalf] articulate[d] [his] opinions on the appropriate geographic market in this case, Scalf responded that his opinions were "confined to paragraph 80 to 82")]. Although Graham's counsel perhaps could have pushed further at Scalf's deposition, this is not a case where exclusion is inappropriate because the complaining party "had all the information relevant to the [nondisclosure issue] . . . . [and] had a full opportunity during [expert's] deposition to question him. . . ." *Jordan v. City of Cleveland*, 464 F.3d 584, 601, n.22 (6th Cir. 2006). Indeed, it was Ring that was on notice of the opinion of McGahee that Scalf "d[id] not perform any analysis or present sufficient economic evidence to support his conclusion." [DE 280-4 at 6053].

regarding market power and Ring's lost profits damages theory. [*See id.* (citing document as "direct evidence of Graham's market power" and "reasons to conclude that Ring would have likely won the ████████ contract.")]. Yet Graham had no notice that Scalf had also relied on this document to shape his geographic market, and thus no reason to inquire about it at Scalf's deposition. Second, to the extent Scalf analyzed whether a SSNIP on PET ketchup bottles would sufficiently incentivize a foreign supplier to compete with bottle manufacturers in the United States, Scalf never disclosed such analysis in his report or at his deposition.

To resist this conclusion, Ring points to Paragraph 46 of his report:



[DE 295-1 ¶ 46]. Yet this paragraph discloses, at most, Scalf's opinion that some foreign bottle manufacturers do not compete in the *product* market. That is, Scalf concludes that the non-barrier PET bottles produced by manufacturers in Europe and Brazil are not substitutes for Scalf's candidate product, PET ketchup bottles (which included oxygen barriers). [*See* DE 295-1 ¶¶ 43–48 (subsection entitled "PET Containers without Active Oxygen Barriers Are Not a Substitute for PET Ketchup Bottles)]. But nowhere in Scalf's report does he explain how his findings regarding the substitutability of foreign products (as relevant to the product market) contributed to his opinion regarding the substitutability of foreign suppliers (as relevant to the geographic market).

Ring appears to argue that any deficiencies in Scalf's Report were cured because Ring disclosed in its "November 2025 Opposition to Graham's *Daubert* motion . . . that Dr. Scalf's

geographic analysis is built on and incorporates arguments from his product market analysis." [DE 465 at 29469]. This argument must be rejected. As an initial matter, Ring's opposition brief did not explain that Scalf's geographic market analysis "built on and incorporates arguments from his product market analysis." [DE 465 at 29469]. Ring stated only that Scalf addressed several of these factors identified by antitrust agencies "to determine the relevant geographic market." [DE 321 at 11943]. Second, even if Ring had clarified that Scalf's analysis of the relevant product market was also the basis for his geographic market analysis, that would have merely highlighted—but not satisfied—Ring's obligation to supplement Scalf's report under Rule 26(e)(2) ("For an expert whose report must be disclosed under Rule 26(a)(2)(B), . . . [a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."). It is not enough, as Ring suggests, that Scalf's report contains in some form the factual predicates he later disclosed were the basis of his geographic market definition. Rather, an expert opinion must not only "set forth facts" but, "in doing so, [must] outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005); *see also R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.") (citation omitted).

Nor does Scalf's deposition testimony provide the necessary "how" and "why" for his geographic market analysis.[9] While experts are generally "allowed to testify concerning information, reports and observations . . . *specifically* referenced in their depositions," any "other supporting materials or additional conclusions are presumptively inadmissible." *Burke v. U-Haul Int'l, Inc.*, No. 3:03-CV-32, 2006 WL 3760317, at *3 (W.D. Ky. Dec. 15, 2006) (emphasis added).

---

[9] [*See supra* n.8].

Here, when questioned at his deposition about Paragraph 46 of his report, Scalf explained that the discussion of "supply chain dynamics" refers to the fact that in some foreign markets "ketchup is not typically stored as long . . . so that means that there's less of a need for an active oxygen barrier in PET ketchup bottles." [DE 295-2 at 7715–16]. And while Scalf did testify that it was "consumer requirements like this" which provided "a reason to believe that [the United States] would be a separate and distinct geographic market," [*id.*], Scalf made no mention of the factors he subsequently identified at the *Daubert* hearing as relevant to suppliers' "incentives" to compete, such as "domestic demand," shipping costs, or the "large costs" and "high risks" associated with developing PET active barrier technology." [DE 463 at 29264]. Moreover, Graham's counsel specifically inquired whether there were "any other areas in the report where [Scalf] articulate[d] [his] opinions on the appropriate geographic market in this case." [DE 295-2 at 7506]. Scalf responded that his opinions were "confined to paragraph 80 to 82." [*Id. See also id.* at 7506–07 (when what he did to "assess what the proper geographic market definition is," Scalf did not identify any of the four categories of evidence).

The other categories of qualitative evidence that Scalf states he relied on were similarly divorced from the context of his geographic market analysis. Scalf testified at the *Daubert* hearing that the historical supply record, bidding history, and perspectives of industry participants all pointed him to "a geographic market defined in the United States":

> "If you look at the historical supply record, all the accompanies that have historically supplied the U.S. ketchup manufacturers with ketchup bottles with active oxygen barrier, all of them are U.S. companies. . . . When companies go out to look for better bids to get lower prices, to get better technology, to get -- to get better product quality, they're only looking for U.S. companies. . . . And when we look at all the record about what all the documents and all the deposition testimony across all the customers and all the suppliers, they're never talking about competition from foreign suppliers or the ability to purchase from foreign suppliers, So all of this all points to a geographic market in the United States.

[DE 463 at 29282–83.]. Yet his report only discusses the supply record evidence cited at the *Daubert* hearing in regard to his finding that "supply relationships in this industry often involve long-term contracts between bottle manufacturers and ketchup producers." [*See* DE 295-1 ¶ 112]. Scalf concludes that "[t]hese contracts reflect the need for consistent, reliable supply of highly standardized packaging components that meet strict food safety and performance requirements." [*Id.*] There is no analysis of the supply record in the context of the relevant geographic market.[10]

Next, to the extent Kraft Heinz's bidding history was discussed in Scalf's report, Scalf only discussed the range of *products* that were the subject of the bid, not the range of *suppliers* to whom the bids were sent. [*See* DE 295-1 ¶ 45 (citing RING0004341 and observing that "in Kraft Heinz's requests for proposal for its ketchup bottle needs, it specifically requested proposals to supply PET ketchup bottles with active oxygen barriers")]. Similarly, Scalf's analysis of industry perspectives were exclusively limited to the product market. [*See, e.g.,* DE 295-1 ¶ 67 ("This consistent industry and trade recognition confirms that PET ketchup bottles are a well-defined antitrust market. PET ketchup bottles are treated as separate *products* with distinct functional characteristics, reinforcing the conclusion that they constitute a distinct *product market*.")].

In sum, Scalf's report falls far short of the disclosure requirements of Rule 26(a). The Court need not determine whether Scalf reliably applied the HMT to determine the geographic market. Although it is clear that three paragraphs devoted to Scalf's geographic market analysis would fail to demonstrate that Scalf's testimony was admissible under Rule 702, it is equally clear that even

---

[10] The Court notes that, at his deposition, Scalf did testify that "the historical record of . . . the suppliers that were turned to" were "all U.S. companies." [295-2 at 7510]. Scalf was required to not only "set forth facts" supporting his decision, but "in doing so, outline a line of reasoning arising from a logical foundation." *Brainard*, 432 F.3d at 664. Scalf's sole reference at his deposition to the supply record in the context of his geographic market definition does not satisfy Ring's disclosure requirements of Rule 26. *See Ciomber*, 527 F.3d at 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.").

53

if Scalf's testimony at the *Daubert* hearing is credited, this testimony reveals a "critical error in the report—its failure to explain the basis for [Scalf's] conclusion[s]." *R.C. Olmstead, Inc.*, 606 F.3d at 271.

Rule 37(c) therefore requires that that the Court exclude the portion of Scalf's testimony related to geographic market unless Ring can show that the failure to disclose was "substantially justified or harmless." *See Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) ("Absent a showing of substantial justification or harmlessness, Rule 37(c)'s 'sanction of exclusion is automatic and mandatory.'" (quoting *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998))). Ring, as "the potentially sanctioned party," has the burden of proving that this untimely disclosure is substantially justified or is harmless. *Roberts*, 325 F.3d at 782. The Sixth Circuit reviews "a district court's decision to impose sanctions for any such noncompliance under an abuse-of-discretion standard." *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015) (quoting *Jordan v. City of Cleveland,* 464 F.3d 584, 600 (6th Cir. 2006)).

"Substantial justification is an objective standard that considers whether the non-producing party has acted reasonably." *Phillips v. Tricam Indus., Inc.*, No. 1:19-CV-00184, 2020 WL 1816468, at *4 (W.D. Mich. Feb. 20, 2020). Additionally, a "harmless" violation generally "involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vaughn v. City of Lebanon*, 18 F. App'x. 252, 264 (6th Cir.2001). *See, e.g.*, Fed.R.Civ.P. 37(c)(1) advisory committee's note (1993) (giving as an example of a harmless violation the "inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties").

The Sixth Circuit has adopted a five-factor test to determine whether a deficiency should be excused as "substantially justified" or "harmless":

54

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe*, 801 F.3d at 748. "The factors simply lend themselves to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019).

The first factor weighs slightly in favor of exclusion. As the Court has already addressed in detail, the analysis described at Scalf's *Daubert* hearing was not disclosed within his report. Nor did Scalf's report adequately put Graham on notice of the areas of Scalf's analysis to explore at his deposition. Ring's only argument that Graham knew or should have known about Scalf's qualitative analysis is that Ring described additional factors that Scalf considered in its opposition to Graham's motion to exclude Scalf. But at most this put Graham on notice of additional "facts or data considered by the [Scalf] in forming" his opinion, not how he conducted his analysis or arrived at his conclusions. Fed. R. Civ. P. 26. Ring stated that Scalf considered "FDA standards," "the importance of manufacturers being able to manufacture bottles near the factories where ketchup is produced," "the differing consumer preferences in the U.S.," and the fact "that "buyers typically evaluate and choose among suppliers on a national basis." [DE 321 at 11943–44]. Yet this information came only *after* Scalf's deposition. Before the *Daubert* hearing, neither Graham nor its expert could have reasonably understood the attorney argument in Ring's opposition briefing to disclose that Scalf conducted a qualitative HMT test based on "product characteristics," "historical supply relationships," "bidding record," and "industry participant perspectives," let alone how and why Scalf used that evidence to reach his geographic market definition. [DE 463

at 29251–52, 30:14–31:2; *see also R.C. Olmstead, Inc.,* 606 F.3d at 271 (experts are required to disclose the "how" and "why" of their opinions)].

The second, third, and fourth factors also weigh against a finding of harmlessness. Graham was not given sufficient notice that would have allowed it to adequately address Scalf's analysis at his deposition. Nor was Graham's rebuttal expert given an opportunity to amend his report to address Scalf's analysis of the four categories of qualitative evidence in the context of his geographic market analysis. There can be no doubt that Scalf's testimony is material to Ring's antitrust claims, which requires proof of a geographic market. Even the lesser sanction Ring proposes would disrupt trial. Ring argues that "[a]t worst, Dr. Scalf should be confined to testifying to the evidence and conclusions in those three paragraphs as to the geographic market while still presenting the full scope of his product market analysis." [DE 465 at 29473]. But Graham would have no meaningful way to cross-examine Scalf regarding the reliability and accuracy of his conclusions contained within those paragraphs without opening the door to Scalf's undisclosed geographic market analysis and prejudicing Graham.

Finally, the fifth factor also weighs in favor excluding Scalf's testimony as to geographic market. As the Court acknowledged at the May 12, 2026, *Daubert* hearing, it does not appear that Ring intentionally concealed or omitted Scalf's geographic market analysis in his report. As discussed above, however, Ring contends that it "urged that Dr. Scalf's geographic analysis is built on and incorporates arguments from his product market analysis" in its "November 2025 Opposition to Graham's Daubert motion." [DE 465 at 29469]. Yet Ring never supplemented Scalf's expert report to disclose which "arguments from his product analysis" underpinned Scalf's geographics market or how exactly Scalf's geographic analysis "built on and incorporate[d]" those

arguments. [*Id.*]. That information was not disclosed to Graham until the *Daubert* hearing. Ring's failure to timely supplement Scalf's report was therefore objectively unreasonable.

Accordingly, the Court will exclude Scalf's opinion on the relevant geographic market in its entirety, including Paragraphs 80–82 of his report and his analysis of the four categories of evidence on which he relied.

iv.    Opinions regarding monopoly power

In *Marathon Petroleum Co. LP*, the court found that because the geographic market defined by the expert was excluded, it could not "be used to calculate market share or demonstrate market dominance." 464 F. Supp. 3d at 892. Graham argues that the same reasoning means Scalf's opinions must be excluded in this case.

"The purpose of defining a geographic market is to reveal whether, or to what extent, market power exists." *In re Se. Milk Antitrust Litig.*, 739 F.3d at 277 (quoting *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1573 (11th Cir.1991)). Without evidence of what the relevant geographic market is the United States, the trier of fact will be unable to find that Graham possessed market power. *See Nilavar v. Mercy Health Sys.-W. Ohio*, 494 F. Supp. 2d 604, 614 (S.D. Ohio 2005), *aff'd*, 244 F. App'x 690, 697 (6th Cir. 2007). In *Nilavar*, the court found that although the plaintiff's proposed expert could opine as to the relevant product market, his proffered testimony with respect to the proposed geographic market was inadmissible under Rule 702 and thus "Plaintiff has failed to offer evidence of a geographic market on which a jury could rely to find that Defendants possessed market power." *Id.* So too here.

To determine market power, Scalf "assess[ed] market shares and barriers to entry in that relevant antitrust market," i.e., the market for PET ketchup bottles in the United States. [DE 295-1 ¶ 85]. Yet for the reasons discussed herein and this Court's contemporaneous order on Graham's

motion for summary judgment, Ring cannot establish the relevant geographic market, which is a necessary element of Ring's antitrust claims under Section 2 of the Sherman Act, 15 U.S.C. § 2. In the absence of Scalf's testimony, there is insufficient evidence in the record from which a jury could find that the United States is the relevant geographic market. *See Kentucky Speedway*, 588 F.3d at 919 ("[L]ay testimony and internal [] documents . . . [do] not provide a sound economic basis for assessing the market."). As a result, Scalf's opinions on market power would be unable to "help the trier of fact to understand the evidence or to determine a fact in issue" and are therefore inadmissible. Fed. R. Evid. 702(a).

v. Opinions regarding injury or damages

Likewise, Scalf's opinion that Ring was injured due to Graham's anticompetitive conduct and his calculation of the resulting damages make "no economic sense" in the absence of "proof of relevant markets." *Kentucky Speedway*, 2008 WL 113987, at *2. Scalf's opinions are relevant only to the extent that Ring has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Graham's] acts unlawful." *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). "The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Prods., Inc. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997).

Here, Graham has shown that it is entitled to judgment as a matter of law on Ring's antitrust claim. Because whether Ring suffered damages due to Graham's alleged anti-competitive conduct is no longer "a fact in issue," Scalf's opinions on these issues are excluded. Fed. R. Evid. 702(a).

Accordingly, Graham's motion to exclude the testimony of Scalf is **GRANTED in part and DENIED in part**, consistent with this opinion.

> 5. *Ring's motion to exclude certain opinions of Floros and McGahee [DE 278];*
> *Ring's motion to exclude opinions of Kinrich [DE 282]*

Graham intends to introduce the testimony of its industry and economics experts, Floros and McGahee, as well as its damages expert, Kinrich, to rebut the opinions Scalf. For the foregoing reasons, however, Scalf's testimony defining the relevant market, establishing Graham's monopoly power within that market, and calculating Ring's damages with respect to its antitrust claim are excluded. Ring's motions are **DENIED as moot**.

## C. Technical Experts

Finally, both parties have retained technical experts in the area of packaging science, whose opinions concern the issue of infringement and validity of the '809 Patent. Relevant here, Ring's technical expert, Dr. Robert Moore ("Moore") opines on (1) whether certain prior art "invalidates" the claims of the '809 Patent; and (2) whether Graham engaged in inequitable conduct before the Patent Office. [DE 299–25 ("Moore Report," filed under seal)]. Graham submitted the expert rebuttal report of Kimmel which contains "an allegation-by-allegation rebuttal" of Moore's opening report. [DE 309 at 11213. *See also* DE 292-1 ("Kimmel Rebuttal Report," filed under seal)].[11] Ring moves to exclude portion of the Kimmel Rebuttal Report.

> 1. *Ring's motion to exclude opinions of Kimmel [DE 290]*

Ring's objections to Kimmel's rebuttal opinions fall into four categories. First, Ring argues that Kimmel's opinions "exceed the permissible scope of expert opinions under the Federal Rules of Evidence" by opining on the state of mind of the named inventors to Graham's '809 Patent. [DE 290 at 7076]. Second, Ring asserts that Kimmel improperly instructs the jury on the law. [*Id.*].

---

[11] Kimmel also submitted an opening expert report, which Ring's motion does not challenge.

Third, Ring asserts that Kimmel offers validity opinions directed to "unclaimed features" of the '809 Patent. [*Id.*]. And fourth, Ring seeks to exclude Kimmel's opinions on secondary considerations relevant to the nonobviousness requirement, because Kimmel failed to analyze whether a sufficient "nexus" existed. [*Id.* at 7088].

      i.    Opinions regarding intent

Ring challenges portions of Kimmel's rebuttal report intended to rebut Moore's conclusions that certain prior art was "but-for" material, and asserts that Kimmel express opinions "regarding whether Graham possessed an intent to deceive the PTO during the prosecution of the '809 Patent—a matter on which he possesses no specialized knowledge or expertise." [DE 292 at 7119]. Graham responds that Kimmel's opinions "merely address Moore's assertions that Graham's inventors 'concealed' and 'withheld' data and planned to deceive the Patent Office." [DE 311 at 11264].

Expert testimony on the intent of a party is "not properly the subject of 'scientific, technical, or other specialized knowledge.'" *Lucio v. Levy Env't Servs. Co.*, 173 F. Supp. 3d 558, 565 (N.D. Ohio 2016) (citing *CMI–Trading v. Quantum Air*, 98 F.3d 887, 890 (6th Cir. 1996); *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 781 (N.D. Ohio 2013) ("No expert, however, knows a party's state of mind.")). "The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful[.]" *Id.*

Courts recognize, however, that technical experts who are qualified POSITAs may provide factual context that goes to the underlying inequitable conduct claim, such as the materiality of undisclosed prior art. *See, e.g., J&M Indus., Inc. v. Raven Indus., Inc.*, 457 F. Supp. 3d 1022, 1046 (D. Kan. 2020) (finding expert, "[a]s a POSITA," was qualified to offer opinions about technical

aspects of the claimed invention that affected validity of the patent, including opinions that the patent was "invalid because the prior art disclosed or anticipated elements of the claimed invention or because a modification of the prior art was obvious"). Yet courts routinely exclude such testimony when experts opine on the intent or state of mind of others. *See id.* at 1046–47 (excluding opinions concerning the [patent] applicants' intent and knowledge, including opinions such as "withholding prior art 'must have been done with the specific intent to deceive' the PTO" and "Plaintiff 'knew . . . prior art contained [certain] elements' when it distinguished another patent," etc.).

Neither Kimmel nor Moore are qualified to opine on the state of mind or intent of Graham's inventors. Statements by Kimmel such as "████████████████████████████████ ████████████████████████████████████████████████ ████████████████████" are outside the scope of his expertise and usurp the role of the jury. [DE 292-1 ¶ 581]. So too are Kimmel's opinions that Graham did not intentionally attempt to conceal data. [*Id.* ¶ 643]. Kimmel may rebut Moore's conclusion that certain record evidence showed "█ ████████████████████████████████████," but he may not speculate on Graham's state of mind when Graham allegedly failed to disclose that evidence to the PTO. And while Kimmel is free to rebut Moore's opinion that the "Schmitz [patent] is relevant to the prosecution of the '809 Patent," Kimmel may not opine as to what Akkapeddi did or did not understand was relevant. [*Id.* ¶ 556].[12] The Court will exclude these statements.

Likewise, it may be permissible for Moore to testify, as he does in Paragraph 794 of his report, that Akkapeddi "acknowledged" that "████████████████████████████████████

---

[12] For example, Kimmel may opine that "Schmitz discloses a composition that 'deliberately achieve[s] long incubation periods which [Schmitz] claim[s] as beneficial (?) for empty container storage of > 50 days'" and that this disclosure "is contrary to the teachings of the '809 Patent." [Kimmel Rebuttal Report ¶ 556].

61

███" because that merely summarizes Akkapeddi's email. [*See* Ring Ex. 25, DE 299-19 ████

█████████████████████████████████████████████████████")].

However, it would not be permissible for Moore to go further by opining that Akkapeddi

understood that the prior art was relevant to prosecution. The same is true of Moore's opinions

regarding the "███████████████████████████████████." [DE 299-25

¶ 826]. Moore's summary of Akkapeddi's email provides useful factual context from which the

fact finder could infer that Graham intentionally concealed Indorama's commercial formulation

by omitting reference to ████████████████████████████ in the '809 Patent. [*Id.*

¶ 827]. Moore may not opine that Graham harbored the intent to deceive the PTO. Thus, the Court

will exclude Moore's testimony to the extent it expresses his opinion that Graham "concealed" or

"falsified" materials, because these phrases imply such an intent. Moore may explain why he

believes omitted information was material, or why Graham's representations were factually false,

but he may not testify as to the intention behind those acts and omissions.

In sum, any expert's opinions regarding intent will be excluded, including, but not limited

to, Kimmel's opinions in the following paragraphs of his rebuttal report: 553 (discussing

Akkapeddi's understanding of whether issued patent was prior art), 556 (discussing Akkapeddi's

understanding of relevance of prior art), 571 (stating when Graham "realized" certain issues), 581

(observing absence of evidence of "ill-intent"), 591 ████████████████████████

█████████████████████████████ ."), 614 (characterizing

Graham's reports as "not obfuscation" rather than simply accurate), 627 (opining "this statement

does not, and is not intended to, describe oxygen ingress for all possible time points in the future"),

643 ("I note that this conclusion does not amount to an intentional attempt by Graham to 'conceal'

this data."), and 650-651 (stating "Graham determined" certain information "should not have been included in the '809 Patent" for various possible reasons Kimmel identified). [13]

ii.    Opinions regarding testing requirements

The Federal Circuit has stated that anticipation "requires only an enabling disclosure," not "actual creation or reduction to practice." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343–44 (Fed. Cir. 2005) (holding a chemical patent inherently anticipated and stating that it was irrelevant whether the inherently disclosed chemical was ever actually produced). "To establish that a prior art reference inherently—rather than expressly—discloses a claim limitation, 'the limitation at issue necessarily must be present, or [is] the natural result of the combination of elements explicitly disclosed by the prior art.'" *Endo Pharms Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1381 (Fed. Cir. 2018) (alteration in original) (quoting *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1196 (Fed. Cir. 2014)).

Relevant here, Moore concludes that certain prior art bottles "anticipate or otherwise render obvious the claims of the '809 Patent." [DE 299-25 ¶ 289 ("                          "), ¶ 433 ("                          "). Graham argues that Kimmel's testimony is relevant to show that Moore cannot establish these bottles anticipated the '809 Patent because the prior art did not expressly disclose the oxygen permeability

---

[13] Ring takes issue with multiple statements by Kimmel that Dr. Moore fails to address or consider certain explanations Graham could have for not disclosing information, such as "the impact of inadvertently equilibrated preforms, such that the time between preform injection, blow molding, and testing significantly impacts oxygen permeability." [Kimmel Rebuttal Report ¶ 622. *See also* DE 292 at 7121 (claiming "Dr. Kimmel offered a host of other 'intent' opinions Mr. Stoll relied on" and citing numerous paragraphs including the above language from Kimmel's Rebuttal Report)]. Although Kimmel may not opine on whether and when Graham "realized" this impact [Kimmel Rebuttal Report ¶ 571], Kimmel may offer his opinion on what Moore should have considered based on the record.

limitation in Claims 1 and 21. And Moore cannot show that the limitations were disclosed inherently "because a POSITA needs to actually measure the oxygen ingress and calculate permeability of a specific bottle to determine if it satisfies the claim limitations." [DE 311 at 15].

Ring accuses Kimmel of imposing a legal "testing" requirement and in doing so misstates the law on inherency. [*See* DE 292 at 7124 ("In short, Dr. Kimmel imposes an evidentiary burden on Ring not contemplated by the law: that Dr. Moore 'has no reasonable basis' to assert the prior art material or bottle satisfies the oxygen permeability limitations of the '809 Patent because Ring did not travel back in time to 2014 to test a bottle made at that time.")].

Contrary to Ring's assertion, Kimmel is not "imposing an evidentiary burden" on Ring, but is instead challenging the accuracy of Moore's conclusions that certain prior art inherently anticipated the limitations of the claims in the '809 Patent. [*Id.*] Ring claims Kimmel's challenge is erroneous based on his prior testimony, as well as the teachings of the '809 Patent. [*Id.*] Those are arguments for cross-examination, however, not a basis for exclusion. With respect to Ring's concern that Kimmel's testimony expresses a legal requirement that prior art must be physically tested to be an anticipating reference, the Court does not believe Kimmel's testimony goes that far. Kimmel does not opine that a POSITA *always* needs to perform a physical test in order to make an inherency determination. Rather, Kimmel expresses his opinion that Moore's calculations regarding oxygen permeability are unreliable based on the information disclosed in the prior art *in this case*.

Whether certain chemical properties are inherently disclosed in the prior art is a disputed question of fact that is best left for the jury, who will have an opportunity to weigh the testimony of Moore and Kimmel when making that determination. Moreover, the Court will instruct the jury

64

on the law at which time any risk of jury confusion can be addressed with appropriate limiting instructions.

        iii.      <u>Opinions regarding unclaimed elements of patented invention</u>

Next, Ring claims certain sections of Kimmel's rebuttal report offer "opinions regarding unclaimed features of the claimed invention—which are irrelevant to the issue of invalidity." [*Id.* at 7126]. Examples include Kimmel's discussion of the "location and distribution of antimony in the containers" [Kimmel Report ¶¶ 643-44], and whether bottles are formed in layers or if they "simply have additive materials (like a scavenger) dispersed throughout." [*Id.* ¶ 115-18], among other "elements" not within the scope of the claims of the '809 Patent.

In *CureVac v. Biontech SE*, the court excluded the testimony of a technical expert to the extent it relied on an incorrect claim construction. 2025 WL 502745, at *8 (E.D. Va. Feb. 14, 2025). When determining that the prior art did not anticipate each claim of the patent in suit, the expert interpreted the phrase "TFF membrane cassette" to mean a "'TFF membrane cassette' *with a screen*," rather than "the plain and ordinary meaning of 'TFF membrane cassettes'" which the court found referred to "cassettes *with or without* screens." *Id.* at *7–8 (emphasis added). The court excluded the expert's "artificially narrowed construction of the claim term" as "irrelevant and likely to confuse the jury." *Id.* at *8.

Ring asserts that *CureVac* is on all fours with this case because Kimmel reads additional features into the oxygen permeability requirement set forth in Claims 1 and 21 of the '809 patent. Accordingly, Kimmel should not be permitted to discount Moore's conclusion that the '809 Patent was anticipated by prior art because, for example, the prior art "reports oxygen permeability data determined for a bottle sidewall, not the entire wall as specified in the '809 Patent." [DE 292 at 7127 (quoting DE 292-1 ¶ 90)]. Such testimony implies an additional claim limitation for the

oxygen permeability of "the entire bottle wall," [*id.*], in contravention of this Court's claim construction order, which held that the oxygen permeability clauses in Claims 1 and 21 are "limiting only to the extent they create a performance requirement for the bottle wall in accord with their plain and ordinary meaning." [DE 140 at 139].

In response, Graham rehashes its arguments that Kimmel's testimony properly rebuts Moore's conclusion that prior art disclosed the claim limitations of the '809 Patent. In other words, Kimmel's testimony is relevant because it shows what a POSITA would need to understand in order to find that prior art teaches all of the claims limitations in the '809 patent, including the oxygen permeability limitation. [*See id.* at 11271–72 ("Because Moore is missing this data, Kimmel opines that the alleged prior art cannot disclose each limitation of the asserted claims.")].

As discussed above, the Court finds that Kimmel's testimony is admissible to the extent it rebuts Moore's inherency arguments by explaining what a POSITA would understand the prior art to inherently disclose.

That does not mean that Ring's challenges are without merit, however. Kimmel may not opine, for instance, that prior art is distinguishable solely on the basis that it lacks information such as the "location and distribution of antimony in the containers," or other "permeability factors" important for determining oxygen permeability, [DE 292-1 ¶¶ 101-15, 643-44], as these would impute new limitations not present in the '809 Patent. *See CureVac,* 2025 WL 502745, at *8. Indeed, if a POSITA could never find that prior art anticipates the '809 Patent in the absence of certain bottle specifications, then the '809 Patent—which contains no such specifications—would not satisfy the enablement requirement. *See Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988) ("The disclosure in Exhibit 5 is at least at the same level of technical detail as the disclosure in the '491 patent. If disclosure of a computer program is essential for an

anticipating reference, then the disclosure in the '491 patent would fail to satisfy the enablement requirement . . . ."); *see also FastShip, LLC v. United States*, 131 Fed. Cl. 592, 609 (2017), *aff'd as modified*, 892 F.3d 1298 (Fed. Cir. 2018) (enablement requires that a POSITA "be able to practice the claimed invention without 'undue experimentation'").

The result is that Kimmel's testimony may be admissible to the extent it addresses Moore's inherency opinions, and only if proper foundation is laid as to why the absence of certain information would be relevant. [*See, e.g.,* DE 311 at 11271 ("Each of the factors identified by Kimmel are important to determining oxygen permeability and explain why a POSITA would need to perform testing of a container to determine permeability instead of assuming a certain oxygen permeability."); DE 292-1 at 7165 ("As such, when provided only with permeation values but no bottle specifications, I am unable to calculate permeability of the bottle.")]. If Ring believes that Kimmel's testimony lacks foundation or misstates the law, it may raise that objection at trial. However, if Ring believes that it is Kimmel's scientific conclusions that are erroneous, it must address that via cross-examination.

On the other hand, the Court finds that one of Kimmel's statements must be excluded. Kimmel's attempt to distinguish the Liu patent because "th[e] table reports oxygen permeability data determined for a bottle sidewall, not the entire wall as specified in the '809 Patent," [DE 292-1 ¶ 128], is based on an erroneous claim construction. The Court construed the oxygen permeability performance requirement to apply to "the bottle wall," the plain and ordinary meaning of which includes the sidewall. [DE 140 at 2896]. This statement is therefore "irrelevant and likely to confuse the jury." *CureVac*, 2025 WL 502745, at *8.

67

iv.      Opinions regarding secondary considerations

Ring contends that "Kimmel has failed to show any nexus to any secondary considerations of non-obviousness and therefore Kimmel's opinions concerning secondary considerations should be excluded under Rule 702." [DE 292 at 7139].

Secondary considerations such as commercial success, long felt but unresolved need, the failure of others to invent, and unexpected results are relevant to whether an invention would have been obvious to a POSITA. *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998). However, "evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (citation modified). The "patentee is entitled to a rebuttable presumption of nexus . . . when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* at 1373. If the patent owner cannot show the product is coextensive with the claimed invention, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). If there is no nexus, such evidence is irrelevant.

As an initial matter, there is no presumed nexus because Kimmel did not determine whether the relevant product in this case, Graham's "covered CPTx612 bottles," are coextensive with the '809 Patent. *See Medicines Co. v. Mylan Inc.*, 2014 WL 1227214, at *6 (N.D. Ill. Mar. 25, 2014) (finding the presumption does not apply where expert fails to conduct this analysis). This presumption is not necessary, however, because Kimmel finds that secondary considerations like Graham's commercial success are the direct result of the absence of an induction period in their

bottles, which Kimmel identifies as a unique characteristic of the '809 Patent. Kimmel explains that the "nexus between Graham's commercial success and the Challenged Claims is that the claims require a PET bottle" that satisfies the oxygen permeability requirement "'immediately after the package is formed' [which] eliminates the need for an induction period, permitting Graham to blow bottles onsite for customers." [DE 292-1 at 7174]. Ring's argument that Kimmel does not identify the nexus between the induction period and the claims in the '809 Patent fails because Kimmel specifically ties his discussions of secondary considerations to the oxygen permeability limitation, which per Claims 1 and 21 must be achieved "immediately after the package is formed." [DE 292-1 ¶ 501].

The remainder of Rings' objections go to the weight of Kimmel's testimony but not its admissibility. For instance, Ring faults Kimmel's opinions regarding "unexpected results" for relying on only "four statements from the '809 patent that note 'surprising' results showing no induction." [DE 292 at 7141]. Unlike the case relied on by Ring, *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 609 (N.D. Cal. 2008), Kimmel is not merely "paraphras[ing] what [others] have said," but is explaining that Moore failed to address material contradictory evidence, namely the "express conclusions of surprising results" based on "oxygen ingress data" disclosed in the '809 Patent. [DE 292-1 at 7175–77]. Nor is Kimmel's testimony analogous to the expert's in *Medicines Co. v. Mylan Inc.*, whose commercial success opinion was excluded where customers were "uninformed" of the features of the patent-in-suit the expert attributed commercial success to. 2014 WL 1227214, at *6. Here, Kimmel does support his opinions on commercial success by explaining that "Graham has maintained its business with, at least, Red Gold as a result

of the ability to form a bottle without an induction period to permit Graham to co-locate with Red Gold." [DE 292-1 at 7174].

Accordingly, the Court will not exclude Kimmel's opinions regarding secondary considerations. Ring's motion to exclude Kimmel's testimony is **GRANTED in part and DENIED in part**, consistent with this opinion.

## IV. CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that:

(1) The following motions for leave to seal are **GRANTED**: [DE 308, DE 310, DE 313, DE 316, DE 319, DE 322, DE 337, DE 340, DE 343, DE 346, DE 350, DE 466].

(2) Graham's motion to exclude Hricik [DE 275] is **GRANTED in part and DENIED in part**.

(3) Ring's motion to exclude certain of Stoll's opinions [DE 287; DE 289] is **GRANTED**.

(4) Graham's motion to exclude Scalf [DE 293] is **GRANTED in part and DENIED in part**.

(5) Ring's motions to exclude testimony of Floros and McGahee [DE 278, DE 280], and Kinrich [DE 282; DE 285] are **DENIED as moot.**

(6) Ring's motion to exclude testimony of Kimmel [DE 290; DE 292] is **GRANTED in part and DENIED in part**.

May 22, 2026

Rebecca Grady Jennings, District Judge
United States District Court

Cc: Counsel of record

70