**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:23-CV-00110-RGJ**

**GRAHAM PACKAGING COMPANY, L.P.** **PLAINTIFF**

**VS.**

**RING CONTAINER TECHNOLOGIES, LLC** **DEFENDANT**

# MEMORANDUM OPINION AND ORDER

At issue in this patent-infringement action is whether Defendant Ring Container Technologies, LLC ("Ring") is entitled to attorneys' fees and costs for Plaintiff Graham Packaging Company, L.P.'s ("Graham") delayed disclosure of relevant discovery. With the Court's permission, Ring filed a Motion for Attorneys' Fees. (DN 369; DN 371). Graham responded in opposition. (DN 377; DN 379). And Ring filed a reply. (DN 383; DN 385). Fully briefed, this matter has been referred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(A), for resolution of all non-dispositive matters, including discovery issues.[1] (DN 18).

## I. Background

### A. Claims and Defenses

This case centers on U.S. Patent No. 11,345,809, entitled *Oxygen Scavenging Compositions Requiring No Induction Period* (the "'809 Patent"), which was issued to Plaintiff Graham Packaging Company, L.P., on May 31, 2022, after seven years of patent prosecution. (DN

[1] The Sixth Circuit has recognized that sanctions awarding attorneys' fees or costs under Federal Rule of Civil Procedure 27 are non-dispositive pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A). *Golden v. Ohio Dept. of Rehab. & Corr.*, No. 2:23-cv-7, 2025 WL 1923893, at *2 (S.D. Ohio July 14, 2025) (citing *Starcher v. Correctional Med. Sys., Inc.*, 144 F.3d 418, 421-25 (6th Cir. 1988); *Baker v. Peterson*, 67 F. App'x 308, 311 (6th Cir. 2003)).

1-1). Graham alleges that its competitor, Defendant Ring Container Technologies, LLC, began marketing and selling a container in 2018 that infringes on Graham's '809 patent. (DN 74, at ¶ 6). Ring defends that Graham's '809 patent is invalid and that even if it was valid, Ring's product does not and has not infringed. (DN 14, at ¶¶ 53-54). To support its invalidity defense, Ring identifies that Graham's patented technology uses prior art from a third-party, Indorama Ventures (hereinafter "Indorama"), called "OxyClear®," which was developed prior to the application for the '809 patent being filed. (*Id.* at ¶¶ 90-97). Ring asserts that Graham knew Indorama's OxyClear® product was prior art already for sale on the market but sought a patent for the product anyway. (*See* DN 172).

B. <u>Discovery Issues</u>

The discovery process in this case was excessively contentious. In March 2024, the Court issued a Memorandum Opinion and Order ruling on a Motion to Compel (DN 47) filed by Ring. (DN 96). One issue was the sufficiency of Graham's responses to Ring's INT Nos. 9 and 10, which were contention interrogatories asking whether Graham contended that Indorama's OxyClear® is prior art for the '809 patent and whether it contends the '809 patent is valid despite such prior art. (*Id.* at PageID # 2399-2402). The Court determined that Ring was "entitled to seek these contentions, as they are related to central claims and defenses in the case, and [was] entitled to discover the facts and application of law to facts that support such contentions." (*Id.* at PageID # 2402).

The Parties' inability to compromise in discovery persisted. (*See* DN 106; DN 129; DN 133; DN 157; DN 165). Eventually, Ring filed a Motion for Sanctions, alleging insufficiency with Graham's responses to INT. Nos. 3, 9, 10, and 20. (DN 172; DN 174). Believing Graham's insufficiencies were willful and in bad faith, Ring requested that: (1) Graham be barred from

offering any new arguments or evidence concerning its contentions as to why its own offers to sell Indorama OxyClear® bottles may not be prior art or may be different than the asserted claims; and (2) the Court deem facts concerning Graham's prior offer of sale to Heinz (hereinafter "Heinz" or "Kraft/Heinz") established and inform the jury of such. (DN 174, at PageID # 3731-32).

C. The Court's May 29, 2025 Memorandum Opinion and Order

Based on the evidence presented by Ring, the Court determined that Graham failed to appropriately respond to Ring's INT Nos. 3 and 20.[2] (DN 239, at PageID # 5299). The Court further found that Graham failed to comply with the Court's March 21, 2024 Order by not providing supporting facts and citations to supporting documents in responding to INT Nos. 9 and 10. (*Id.* at PageID # 5301). But the Court declined to grant the quasi-dispositive sanctions Ring requested because Graham's incomplete responses were "substantially justified." (*Id.* at PageID # 5303).

Considering whether less serious sanctions were warranted, the Court found the "same substantial-justification analysis largely applies to whether reasonable expenses should be incurred regarding Ring's filing of this Motion." (*Id.* at PageID # 5306). In finding such, the Court noted that prejudice to Ring was "minimal and rectifiable" and that many of Ring's arguments "could have been addressed without costly motion practice." (*Id.* at PageID # 5307).

Ultimately, the Court found Graham's behavior warranted "a brief extension of discovery [for Ring] to obtain any outstanding discovery or testimony on the topics that Graham failed to appropriately respond to in discovery (Graham's prior supply contract negotiations with Heinz and

[2] The Court sealed the May 29, 2025 Memorandum Opinion and Order in its entirety because it quotes from and relies heavily on information from the Parties' sealed exhibits and because filing a redacted version of the Opinion would largely render it meaningless. (DN 239, at PageID # 5284, n. 1). However, reference to the Court's determinations and conclusions from the Opinion may be quoted without revealing any of the Parties' confidential information and will be quoted accordingly in this Opinion.

any other customers, and Graham's use of prior art from Indorama/Auriga)." (*Id.*). The Court then issued the following guidance regarding Ring's ability to request attorneys' fees:

> To the extent that Ring requested such information during the discovery period and Graham has not complied, Ring will be entitled to seek reasonable fees and expenses associated with securing this discovery. But to the extent that Ring requests additional information on these topics from Graham for the first time, no expenses or fees will be awarded.

(*Id.*).

D. Additional Discovery

As a result of the Court's May 29, 2025 Opinion, Ring sought the following additional discovery from Graham:

(1) Documents responsive to Ring's previously served discovery requests related to Graham's prior sales and negotiations with Heinz and other customers and Graham's use of prior art materials from Indorama/Auriga;

(2) Emails sent or received by the Graham personnel who prepared materials for or attended the March 2013 meeting between Heinz and Graham; and

(3) A supplemental deposition of John Denner to testify regarding Graham's 2013 prior offers of sale to Heinz and Graham's prior offers for sale to Pepsi of [redacted] using Oxyclear 3500 and 2700.

(*See* DN 42). When Graham objected to these requests, the Court held a telephonic conference and provided additional guidance regarding the appropriate scope of the extended discovery period. (DN 252). The Court determined that:

(1) Graham shall search for relevant emails from Mr. Denner and Mr. Akkapedi relating to the prior offers of sale with Kraft-Heinz in 2013. The Parties can agree on search terms that can assist in targeting the relevant documents. To the extent that relevant emails extend beyond Mr. Denner and Mr. Akkapeddi, the Parties shall confer on the need for identification of additional custodians. This determination is meant to provide Ring with the relevant discovery not previously produced but also protect Graham from overly burdensome email requests at this late stage in the litigation.

(2) Ring may take the deposition of Mr. Denner remotely for no more than three hours, limited to questioning regarding the prior offers of sale with Kraft-Heinz in 2013

> and the alleged prior offers of sale with Pepsi. The Parties shall work together in advance of the deposition to limit [sic] scope of questioning on those topics.
>
> (3) The Court does not find either the reopening of Graham's Rule 30(b)(6) deposition or the new deposition of Michael Carleton currently falls within the scope of appropriate additional discovery.

(*Id.*).

According to Ring, Graham responded to the supplemental discovery requests by producing "highly relevant, previously requested documents . . . which necessitated re-deposing two fact witnesses." (DN 369, at PageID # 15490). Specifically, Ring says that Graham's supplemental production included: "additional materials relating to alleged offers for sale to Heinz and Pepsi in 2013" and "three contracts with Pepsi." (DN 369, at PageID # 15491-92 (citing DN 369-1)). These documents, Ring alleges, were responsive to discovery requests served at the outset of the case, including RFP No. 10, seeking "[a]ll documents and communications relating to any past, current, or future requests for proposal, bids, offers, contracts, negotiations, or other agreements concerning the sale or prospective sale of all Practicing Products." (*Id.* (citing DN 243-1, at 3)). Because Graham's supplemental production included Pepsi documents, Ring also sought to depose a Rule 30(b)(6) witness with knowledge of the Pepsi dealings.

Graham, on the other hand, says the additional discovery was not extensive and was "negligible and insignificant to the issues in the case." (DN 377, at PageID # 15789, 15794). The supplemental discovery, Graham clarifies, resulted in production of only 28 documents from Graham, a supplemental two-hour deposition of John Denner, and a deposition of Mr. Howell relating only to the Pepsi documents. (*Id.* at PageID # 15789).

Ring now seeks attorneys' fees relating to Graham's late production of the Pepsi Agreements and the Rule 30(b)(6) deposition of Mr. Howell on September 25, 2025 regarding the Pepsi Agreements, as well as Graham's late production of Heinz discovery and the repeated

depositions of John Denner. (DN 369, at PageID # 15492-15501). Ring further seeks fees related to the emails Graham produced during the extended discovery period.

II. Legal Standard

Federal Rule of Civil Procedure 37(c) provides that a court may order sanctions if a party fails to provide discovery as required by Rule 26(e), which includes supplementation of requested discovery. The Court may order the payment of reasonable expenses, including attorneys' fees, caused by the failure, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1)(A).

To determine whether a party's omitted or late disclosure is "substantially justified" or "harmless," the Sixth Circuit considers five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014) (add'l citation omitted)). The Advisory Committee Notes to the 1993 Amendments, which include Rule 37(c)(1), "strongly suggest[] that 'harmless' involves an honest mistake on the part of the party coupled with sufficient knowledge on the part of the other party." *Howe*, 801 F.3d 718, 747 (6th Cir. 2015) (quoting *Vance, ex rel. Hammons v. United States*, 182 F.3d 920, at *5 (6th Cir. 1999)). "District courts have broad discretion in applying these factors and need not apply each one rigidly." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (quoting *Bentley v. Highlands Hosp. Corp.*, No. CV 15-97-ART-EBA, 2016 WL 5867496, at *10 (E.D. Ky. Oct. 6, 2016)).

III. Analysis

Graham presents several broad arguments for why Ring's Motion should be denied in its entirety. First, Graham attempts to cut Ring's arguments off at the knees by insisting it has now fully responded to and complied with Ring's discovery requests. (DN 377, at PageID # 15788). Essentially, Graham urges there is "no harm, no foul," because Ring was in possession of all previously withheld information before filing dispositive motions and well in advance of the trial date. (*Id.* at PageID # 15788-89). Ring responds that although Graham has now produced the outstanding responsive documents, Ring is still entitled under the Court's May 29, 2025 Opinion to seek fees for its efforts to obtain the wrongfully withheld discovery years after it was requested and months after the Court ordered production. (DN 383, at PageID # 15895).

That Graham has now provided the previously withheld discovery documents does not foreclose Ring's opportunity to seek attorneys' fees. The Court's May 29, 2025 Opinion articulated that Ring could seek reasonable attorneys' fees and expenses associated with securing discovery Ring requested during the discovery period that Graham did not provide. (DN 239, at PageID # 5307). Additionally, the Court's October 15, 2025 Order setting a briefing schedule for Ring's Motion for Attorney's Fees clarified that the May 29, 2025 Opinion gave Ring "the opportunity to request attorney's fees related to Graham's previous failures to respond and comply with discovery but does not guarantee that Ring will be entitled to such fees." (DN 272). While Graham's eventual compliance may bear on whether its previous deficiencies were substantially justified or harmless, the Court will not outright deny Ring's request based on such compliance.

Graham further aims to thwart Ring's Motion in its entirety by arguing that the Court already denied Ring's request for sanctions. (DN 377, at PageID # 15796). In Graham's view, the Court's May 29, 2025 Opinion "chided Ring" by stating that many of Ring's arguments could have

been addressed without costly motion practice. (DN 377, at PageID # 15797 (citing DN 239)). Graham stresses that the Court found Graham had not acted in bad faith and that any prejudice to Ring was minimal and rectifiable through the reopening of discovery for limited discovery and depositions. (*Id.*). To Graham, the Court's previous determination that sanctions were not justified is "even more true now that Ring has been able to conduct discovery on these issues." (*Id.*).

While Graham accurately describes the Court's determination that Graham's late and incomplete responses to Ring's interrogatories were substantially justified, Graham does not present the full picture. The Court noted that it was unclear from Ring's briefing whether Ring sought and had been unable to obtain the outstanding discovery from Graham or depositions relating to Graham's failures after Graham's large document production in May 2024. (DN 239). The Court further stated that Ring would be entitled to a brief extension to obtain the discovery that Graham failed to appropriately respond to (Graham's prior supply contract negotiations/prior offers of sale with Heinz and any other customers, and Graham's use of prior art from Indorama/Auriga). (*Id.*). The Court then advised: "[t]o the extent that Ring requested such information during the discovery period and Graham has not complied, Ring will be able to seek reasonable expenses and fees associated with securing this discovery." (*Id.*). The Court would not have included this language if it meant for its prior determination to foreclose the possibility of Ring requesting attorneys' fees for Graham's discovery failures. Rather, the Court anticipated that after the extended discovery period, Ring could provide more information relating to its efforts to obtain the outstanding discovery. Accordingly, Ring's Motion will not be denied on these grounds.

Graham next argues that none of the information produced in the extended discovery period (emails, Kraft-Heinz discovery, Pepsi discovery, deposition testimony from Mr. Denner, and deposition testimony from Mr. Howell) falls within the scope of the Court's May 29, 2025 Opinion

permitting Ring to seek attorney's fees. (DN 377). Graham maintains none of this discovery was belatedly disclosed or omitted. (*Id.*). But even if it were, Graham says sanctions are unjust because any delay or failure was substantially justified or harmless. (*Id.*).

A. Kraft-Heinz Discovery

Ring argues that the Kraft-Heinz documents Graham produced on June 26, 2025 relating to allegedly invaliding offers for sale were responsive to Ring's RFP No. 10, issued at the outset of the case. (DN 369, at PageID # 15499-501). Graham's consistent failure to provide the responsive Heinz documents, Ring argues, necessitated Ring taking Mr. Denner's deposition four times during the case. (*Id.*). Ring submits the Heinz discovery and Denner depositions fall directly within the scope of the Court's May 29, 2025 Opinion, which permitted Ring to seek fees for Graham's "fail[ure] to appropriately respond in discovery (Graham's prior supply contract negotiations/prior offers of sale with Heinz)." (DN 239).

Graham argues it did not withhold facts surrounding its interactions with Heinz because it produced responsive documents to INT Nos. 3, 9, 10, and 20 *months* before fact discovery ended. (DN 377, at PageID # 15797-98 (emphasis in original)). Graham maintains it did not identify an interaction with Kraft-Heinz in 2013 in response to interrogatories that sought disclosure of "offers to sell" its patented technology because it denies that the Kraft-Heinz negotiations constituted a legally cognizable offer for sale. (*Id.* at PageID # 15798).

Once more, the Court explicitly reopened discovery for Ring to obtain additional discovery from Graham on topics Graham failed to appropriately respond to in discovery, including "prior supply contract negotiations/prior offers of sale with Heinz." (DN 239, at PageID # 5308). The Court then indicated that "Ring may be entitled to seek reasonable expenses, including attorney's fees, associated with securing such discovery." (*Id.*). Any additional Heinz documents produced

by Graham in the extended discovery period, as well as related testimony from Mr. Denner, clearly fall within the scope of the Court's directives.

The next question is whether Graham's delays in producing the Kraft-Heinz discovery were substantially justified or harmless. As to the first *Howe* factor, Graham says Ring cannot be surprised by any Kraft-Heinz evidence since such evidence was in Ring's possession months before fact discovery ended. (DN 377, at PageID # 15798-99). To be sure, Graham points out that Ring questioned Graham's witnesses about these materials in depositions *before* the Court extended the discovery period. (*Id.* (citing DN 174)). Because this information was known to Ring during fact and expert discovery and because Ring submitted numerous expert reports relying on Graham's interactions with Kraft-Heinz in 2013 as a basis for alleged invalidity, Graham submits that Ring cannot in good faith argue surprise. (*Id.*).

Ring says surprise is evident from it needing to take four separate depositions of Mr. Denner due to Graham's belated disclosures of the Kraft-Heinz discovery. (DN 369, at PageID # 15502-503). Ring asserts that Graham's responses to INT Nos. 3, 9, and 20 were deficient and misleading because although Graham produced three relevant Heinz documents "in a sea of more than 80,000 pages of documents in May 2024[,]" Graham neglected to disclose it was "aware of Indorama prior art, the combination of the same into bottles, and that those bottles met at least one claim of the '809 Patent." (DN 383, at PageID # 15897).

A party may be "surprise[d]" if "[n]othing in the record indicates that [the party] knew or could have known about the existence" of the belated discovery. *Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 982 (6th Cir. May 25, 2017). "Eleventh-hour revelations shock the unsuspecting." *Silitonga v. Ky. St. Univ.*, No. 3:16-CV-29-REW-EBA, 2018 WL 3969951, at *2 (E.D. Ky. Aug. 20, 2018).

This factor is neutral. While Ring may have initially been surprised when it located the three Kraft-Heinz documents within the 80,000-page document-dump produced by Graham in May 2024, this was not an eleventh-hour discovery. However, Ring worked tirelessly to obtain any additional discovery relating to Kraft-Heinz, some of which Graham did not produce until the Court extended the discovery deadline a year later. And Ring was forced to elicit testimony from Mr. Denner on four separate occasions during the litigation due in part to the piecemeal production of the Kraft-Heinz discovery. To the extent that Ring received additional discovery relating to Heinz during the extended discovery period, which necessitated a fourth deposition of Mr. Denner, Ring experienced some degree of surprise.

Graham asserts the second factor supports its position since any surprise was cured through additional discovery ordered by the Court. (DN 377, at PageID # 15799). Ring responds that Graham's "better late than never" approach ignores the effort and expense Ring exerted to obtain this discovery that Graham should have provided at the outset. (DN 383, at PageID # 15897). Ring explains it was not able to depose Mr. Denner regarding Graham's belated Heinz disclosures until July 1, 2025, his fourth time appearing for a deposition. (*Id.*). The fact that Graham eventually produced the documents, Ring argues, does not recuperate litigation costs or the two years' opportunity cost in obtaining new customers while defending against Graham's fraudulent patent. (*Id.* at PageID # 15898).

One consequence of surprise "is that the tardily-producing party's inequitable (and Rule-violative) conduct precludes the innocent opponent from fairly assessing, at the proper procedural point of the case, the evidence and witnesses to be offered at trial . . . [which] inhibits litigants from making rational, fully informed case-related decisions." *Silitonga*, 2018 WL 3969951, at *3. And a court's reopening of discovery to cure surprise "counsels against a finding of substantial

justification or harmlessness." *Coleman v. Wal-Mart Stores East, LP*, No. 22-54-DLB-EBA, 2023 WL 7132938, at *4 (E.D. Ky. Oct. 30, 2023) (citing *Jackson v. Transp. Corp. of Am., Inc.,* No. 1:21-cv-01325-PAB, 2023 WL 3058158, at *7 (N.D. Ohio Apr. 24, 2023)); *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F. 4th 659, 669 (6th Cir. 2024).

That the Court had to reopen discovery for Graham to produce all of the Kraft-Heinz documents weighs against its delays being substantially justified. Moreover, that Ring had to depose Mr. Denner on four separate occasions, the last time resulting from Graham's late production of the remaining Kraft-Heinz discovery, shows the effects of Graham's belated disclosures. Though the surprise may have been technically "cured" through the extended discovery, including Mr. Denner's fourth deposition, Ring was still unable to make rational fully informed case-related decisions during the discovery period and before its expert disclosures were due. This factor weighs in Ring's favor.

As for the third factor, disruption of trial, Graham argues the additional discovery was not disruptive because minimal additional materials were produced and the discovery was completed before summary judgment briefing, with trial still four months away. (DN 377, at PageID # 15799). To Ring, Graham's "extreme delay" robbed it of the chance to move for summary judgment on invalidity earlier and multiplied the costs of this litigation. (DN 383, at PageID # 15898).

Although the additional Kraft-Heinz production came late in the case during the extended discovery period, Ring was still able to incorporate the discovery and Mr. Denner's deposition testimony into its dispositive motions and responses to Graham's dispositive motions. The late production of the documents and fourth deposition of Mr. Denner did not interfere with the trial date. This factor, accordingly, weighs in favor of Graham's claims of harmlessness.

As to the fourth factor, Graham asserts the Kraft-Heinz evidence is not important "because no reasonable juror could find that Graham's interactions with Kraft-Heinz constituted a commercial offer for sale." (DN 377, at PageID # 15799-800). Instead, Graham argues, the interactions with Kraft-Heinz were merely routine confidential communications regarding research and development work Graham was conducting at that time. (*Id.* at PageID # 15800). Even if the evidence could be considered "important," Graham maintains it is duplicative of information that Ring already had in its possession, meaning it had negligible significance. (*Id.*).

Ring responds that Graham cannot use its subjective expectation of victory at trial to excuse its failure to disclose relevant and responsive information in discovery. (DN 383, at PageID # 15898). Ring states that testimony from Mr. Denner's fourth deposition confirms the Kraft-Heinz discovery was critical. (*Id.* (citing Ex. A, Denner Transcript 637:25-638:4)). According to Ring, the importance of the Kraft-Heinz evidence is also clear from Graham dropping half of its assertion of claims of the '809 Patent after Mr. Akkpeddi testified regarding the Kraft-Heinz offers at his deposition. (*Id.* at PageID # 15899). Ring concludes Graham buried its Kraft-Heinz information in the 80,000-page production and failed to admit its knowledge of the same in response to Ring's interrogatories. (*Id.*).

In the exclusion-of-evidence context, courts have found this factor to "cut both ways" in that "[t]he more important the proof, the greater the effect of preclusion, but also the greater harm in tardy disclosure." *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, No. 5:16-CV-150-JMH-REW, 2017 WL 2295906, at *5 (E.D. Ky. May 25, 2017) (collecting cases). This concern is less applicable here since the Court has ruled out exclusion as an appropriate remedy and is evaluating only whether attorneys' fees are appropriate.

The Court agrees with Ring that the Kraft-Heinz discovery and Mr. Denner's testimony from the fourth deposition regarding the Kraft-Heinz documents are important. For instance, Mr. Denner confirmed during his fourth deposition during the extended discovery period that though [redacted] (DN 385-1). And although Graham alleged the discovery was "duplicative of information Ring already had in its possession[,]" Graham does not demonstrate the new information's similarity to previously disclosed evidence. The importance of the evidence, accordingly, weighs in Ring's favor.

Regarding the final *Howe* factor, Graham says that even if it should have identified these documents in interrogatory responses, its failure was justified because Ring had plenty of time to review the materials. (DN 377, at PageID # 15800). According to Ring, Graham has failed to show any explanation for its failures beyond its belief that these materials do not show a prior offer of sale. (DN 383, at PageID # 15900).

The final factor "speaks directly to whether [a party's] untimely disclosure[] was 'substantially justified.'" *Bentley*, 2016 WL 5867496, at *11. In this context, "'explanation' looks more at the feasibility of full and timely disclosure than it does at the parties' intent." *Samsung Elecs. Co., Ltd. v. Nvidia Corp.*, 314 F.R.D. 190, 199-200 (E.D. Va. 2016).

The Kraft-Heinz discovery has been an issue throughout the case. Despite failing to mention its dealings with Kraft-Heinz in responding to INT Nos. 3, 9, and 20, Graham produced three relevant Kraft-Heinz documents in a production of 80,000 pages in May 2024. Upon discovering the three Kraft-Heinz documents, Ring began working to get Graham to supplement its production to include other relevant Kraft-Heinz discovery. This Court's May 29, 2025 Opinion confirmed that Graham had failed to respond appropriately to Ring's interrogatories based on the

existence and production of the three Kraft-Heinz documents. (*See* DN 239). Then, even in the extended discovery period, Graham continued to oppose the scope of production of the Kraft-Heinz discovery and related depositions. (DN 246; DN 252). As outlined in detail above, the Court explicitly ordered that Ring could take Mr. Denner's deposition as to alleged prior offers of sale with Kraft-Heinz in 2013. (DN 252).

Considering these circumstances, Graham could have fully and timely disclosed the Kraft-Heinz documents over a year before they were produced. The Court cannot say that Graham's belated disclosure of the Kraft-Heinz documents in the extended discovery period, which necessitated a fourth deposition of Mr. Denner, was harmless or substantially justified. The Court, accordingly, finds Ring is entitled to attorney's fees relating to the Kraft-Heinz discovery and related deposition. However, the Court limits Ring's recovery to the following: (1) the fees and costs associated with obtaining the Kraft-Heinz discovery following the Court's May 29, 2025 Opinion;[3] and (2) the fees and costs associated with scheduling and taking Mr. Denner's fourth deposition.

B. <u>The Pepsi Discovery</u>

Like the Kraft-Heinz discovery, Ring argues the Pepsi Agreements that Graham produced during the extended discovery period were responsive to Ring's RFP No. 10, served more than two years earlier in August 2023. (DN 369, at PageID # 15492-93). And, Ring asserts, the Pepsi Agreements were also responsive to a targeted discovery request (RFP No. 52), served on Graham

[3] As will be discussed in subsection (C), the 28 emails Graham searched for and produced are considered separately from any other Kraft-Heinz discovery produced during the extended discovery period. It is unclear from the Parties' briefing whether any additional documents relating to Kraft-Heinz, beyond the emails, were produced during the extended discovery period, but the Court's granting of attorney's fees here does not relate to the subsequent email searches and production. (*Compare* DN 371, at PageID # (Ring claiming the additional discovery resulted in "three additional depositions of Mr. Denner, one additional deposition of Mr. Howell, two supplemental expert reports, and months of additional discovery, briefing, and court hearings") *with* DN 377, at PageID # 15789 (Graham claiming that "[i]n actuality, the additional discovery resulted in a production of 28 documents from Graham, and a 2-hour deposition of John Denner.")).

in March 2025. (*Id.*). In Ring's view, Graham withheld the Pepsi Agreements, then later affirmed they were responsive, then finally, after much debate over redactions and confidentiality, produced the full documents. (*Id.*). Relatedly, Ring asserts that had Graham produced the Pepsi discovery in response to RFP No. 10, Ring could have questioned Mr. Howell regarding such discovery during his original deposition in 2024. (DN 369, at PageID # 15499).

The Pepsi discovery, Graham responds, falls outside the scope of the Court's Order because that Order did not address discovery of Pepsi materials. (DN 377, at PageID # 15800-801). Graham explains that Ring served RFP No. 52 on Ring "immediately before the close of discovery" and long after Ring filed its Motion to Compel. (*Id.* at PageID # 15790-91). Given that Ring requested the Pepsi materials for the first time at the end of discovery, Graham urges that no expenses or fees should be awarded. (*Id.*). As for Ring's allegations regarding Graham dragging its feet in producing the non-redacted Pepsi documents, Graham submits that it was working diligently with Pepsi to obtain permission to produce the documents and repeatedly communicated with Ring about the process. (*Id.*).

In reply, Ring advances that Graham "hid the Pepsi materials" and that Graham's Response fails to address that the Pepsi materials were responsive not only to RFP No. 10, but also to INT Nos. 3, 9, and 10. (DN 383, at PageID # 15901-902). Ring argues that under the broad umbrella of relevancy, the Pepsi agreements should have been produced long before Ring issued RFP No. 52 in March 2025. (*Id.*). Ring further asserts that by the time Graham produced the unredacted versions of the Pepsi agreements, the deadline for expert reports had already passed, and it was therefore forced to request a Rule 30(b)(6) deposition to get testimony regarding this discovery. (*Id.* at PageID # 15904-905).

Ring's RFP No. 10 issued "at the outset of the case" sought "[a]ll documents and communications relating to any past, current, or future requests for proposal, bids, offers, contracts, negotiations, or other agreements concerning the sale or prospective sale of all Practicing Products." (DN 369, at PageID # 15492 (quoting DN 243-1, at PageID # 5335)). In March 2025, shortly before the fact discovery deadline expired, Ring issued RFP No. 52, which sought: "[a]ll documents and communications relating to qualifications, contracts, or other agreements with PepsiCo from 2010 to 2016 concerning the making, sale, or prospective sale of 10 oz Tropicana bottles, including any such bottles made with OxyClear® materials. (*Id.* at PageID # 15493 (quoting DN 243-1, at PageID # 5336)).

As has been stated *ad nauseum*, the Court's May 29, 2025 Order briefly extended the discovery period to allow Ring "to obtain any outstanding discovery or testimony on the topics that Graham failed to appropriately respond to in discovery (Graham's prior supply contract negotiations with Heinz and any other customers, and Graham's use of prior art from Indorama/Auriga)." (DN 239, at PageID # 5307).). The Pepsi discovery falls into "outstanding discovery or testimony on topics that Graham failed to appropriately respond to in discovery," as contemplated by the undersigned's Opinion. The Pepsi agreements constitute "prior supply contract negotiations with . . . **any other customers[.]**" (*Id.* (emphasis added)). Though Ring did not issue RFP No. 52 until the end of discovery and while its Motion for Sanctions was already pending, the Court agrees that the Pepsi agreements fall within the scope of RFP No. 10, issued in August 2023.

The same is true for the deposition testimony relating to the Pepsi documents. Ring did not specifically request this testimony in its Motion for Sanctions because Ring was not in possession of the documents motivating such testimony. Since the Rule 30(b)(6) testimony naturally flows

from the production of the Pepsi Agreements, such evidence falls within "testimony on the topics that Graham failed to appropriately respond to in discovery." Accordingly, the Pepsi discovery and subsequent deposition fall within the scope of the Court's May 29, 2025 Opinion.

Were Graham's delays in producing the Pepsi discovery substantially justified or harmless? As to the first *Howe* factor, Graham claims Ring could not be surprised by the Pepsi Agreements because it waited until the end of discovery to request these materials when it had plenty of opportunities during the case to request the information. (DN 377, at PageID # 15802). Ring reiterates that RFP No. 10, as well as INT. Nos. 3, 9, and 10, encompass the Pepsi discovery, making Graham's attempt to pigeonhole the Pepsi discovery into RFP No. 52 dubious. (DN 383, at PageID # 15905). To prove "surprise," Ring emphasizes that it did not know the Pepsi documents existed until a third-party deposition with Indorama in April 2025. (*Id.* at PageID # 15894). Moreover, Ring says it could not elicit necessary testimony from witnesses since Graham hid the Pepsi documents and delayed full production for months by making sweeping and invalid redactions. (*Id.* at PageID # 15905-906).

Ring learned of the existence of potentially relevant Pepsi materials after receiving documents from third-party Indorama during an April 2025 deposition, showing Indorama had worked with Pepsi to make Tropicana bottles using Pepsi's regular supplier Graham. (DN 383, at PageID # 15894). This revelation surprised Ring since Graham had never identified any Pepsi documents in responding to RFP No. 10 at the start of the case. Nor had Graham produced any Pepsi materials in the "document dump" that revealed the Kraft-Heinz negotiations. As a result, Ring issued RFP No. 52, specifically targeting Pepsi discovery, at the end of the initial discovery period.

Ring reasonably felt additional surprise when Graham took months to produce fully unredacted copies of the agreements during the extended discovery period. On the one hand, Graham produced largely redacted copies of the agreements because it was working with Pepsi, a third-party, regarding confidentiality concerns. (*See* DN 369-1, at PageID # 15513 (emails reflecting that Graham has been "working with Pepsi to seek permission to produce these contracts. Pepsi is requesting redactions be made to protect Pepsi [sic] confidential information. We are diligently working with Pepsi to be able to produce this information, but do not have an update yet.")). On the other hand, Graham's large-scale redactions of the Pepsi contracts and subsequent delays in producing unredacted copies resulted in Ring finally receiving the full documents after the expert deadlines had passed. This factor, accordingly, tends to cut both ways.

Graham next argues any surprise was cured by the production of documents and by Mr. Howell's deposition, where he specifically answered questions regarding the Pepsi contracts. Because Mr. Howell's deposition occurred more than a month before dispositive motions were due, Graham says Ring had sufficient time to cure any alleged surprise. (DN 377, at PageID # 15803). Ring counters that Graham's late production of documents and deposition of Mr. Howell were "no cure at all" because Ring was forced to incur the expense of preparing and taking another deposition when these topics could have been addressed at Mr. Howell's first deposition. (DN 383, at PageID # 15906). And Ring points out that despite multiple meet-and-confers regarding the deposition, Graham's counsel inappropriately instructed its witness not to answer substantive questions regarding the contracts, which frustrated the very process Graham alleges cured the surprise. (*Id.*).

Again, the Court already reopened discovery to give Ring additional time to secure the Pepsi documents and other discovery that Graham had not previously produced. Even then, Ring

had to goad Graham for months in the extended discovery period to produce fully unredacted copies of the Pepsi agreements. Time and money would have been saved had the Pepsi agreements been produced by Graham in response to RFP No. 10, as the Parties could have conducted a single deposition of Mr. Howell. Time and money also would have been saved had Graham not made large-scale redactions to the Pepsi agreements after being ordered to produce them by the Court. The second factor, therefore, weighs in Ring's favor.

For the third factor, Graham asserts the evidence did not disrupt trial because it was produced eight months before the trial date. (DN 377, at PageID # 15803). Ring notes this factor is inapplicable, as "the true harm to Ring is the cost associated with Graham's failure." (DN 383, at PageID # 15906, n. 8). According to Ring, "each day this lawsuit is pending is another day Graham can claim to Ring's customers that Ring's products infringe its patent." (DN 383, at PageID # 15906).

As demonstrated by Graham, although the Pepsi disclosures came late in the case during the extended discovery period, Ring was still able to incorporate the discovery and deposition testimony into its dispositive motions and responses to Graham's dispositive motions. Nor did the late production of the documents or late deposition interfere with the trial date. However, Ring was forced to spend additional time working with its experts following the Pepsi disclosures and supplementing the expert reports of Dr. Robert Moore and Professor David Hricik, which explain how Graham made a patent-invalidating sale of Tropicana/Pepsi OxyClear® bottles that were tested and used as an example in the Asserted Patent. (DN 369, at PageID # 15494). On balance, this factor is neutral.

As for the fourth factor, the importance of the evidence, Graham maintains the Pepsi contracts are not important because no reasonable jury could find that its interactions with Pepsi

constituted a commercial offer for sale. (DN 377, at PageID # 15803). The interactions with Pepsi, Graham urges, were merely routine confidential communications regarding research and development work Graham was conducting at the time. (*Id.*).

Ring responds that Graham is not the factfinder and cannot unilaterally decide not to produce relevant/responsive material to Ring's requests. (DN 383, at PageID # 15906-907). Ring emphasizes the importance of the Pepsi discovery because it needed those contracts as evidence for its motion for summary judgment on its invalidity counterclaim, as well as opposing Graham's motion for summary judgment on validity. (*Id.*). Specifically, Ring says the Pepsi contracts invalidate Graham's '809 Patent since Graham offered to sell 10 oz. Tropicana bottles and its [redacted] years before the '809 Patent, and these same OxyClear® Tropicana bottles Pepsi requested were used as an "inventive" example in Graham's '809 Patent. (DN 369 at PageID # 15495-96). Because the Pepsi materials were "seminal" to its claims, Ring submits that Graham's intentional withholding of the evidence and subsequent delays and redactions, are telling with respect to the importance of the evidence and Graham's litigation strategy. (*Id.* at PageID # 15907-908).

Ring heavily used the Pepsi evidence in its motions for summary judgment and responses to Graham's motions, confirming its importance. Whether or not this information ultimately proved what Ring wanted it to prove does not bear on its relevance during the discovery period. This factor, accordingly, weighs slightly in Ring's favor.

As to the last factor, Graham alleges any purported failure to disclose the Pepsi agreements was justifiable because Ring did not request the information until the close of discovery and Graham worked diligently to produce the responsive materials before dispositive motions were filed and well in advance of trial. (DN 377, at PageID # 15803). In contrast, Ring asserts there is

no substantial justification for Graham pervasively failing to respond to its discovery requests, actively hiding relevant information, showing intent to withhold information critical to Ring's claims and defenses, and ultimately prolonging the case to serve its own interests in blocking Ring's product from the market. (DN 383, at PageID # 15908).

While finding the Pepsi discovery was responsive to Ring's RFP No. 10, which was issued at the beginning of the case, the Court at the same time recognizes that RFP No. 10 potentially encompassed much information that Ring would reasonably believe was not relevant to the claims and defenses in this case. And once Ring specifically requested the Pepsi discovery in March 2025, and the Court extended the discovery period for the limited purpose of Ring obtaining outstanding discovery, Graham endeavored to comply. However, Graham delayed its compliance by producing copies of the Pepsi Agreements that were almost entirely redacted and, despite explaining it was communicating with Pepsi regarding confidentiality, Graham did not produce the fully unredacted documents for several months. Additionally, Graham exerted obstructive behavior during Mr. Howell's deposition, issuing inappropriate objections and thwarting Ring's access to the information the Court had already deemed relevant and discoverable. (*See* DN 371-3). Like most of the factors in this analysis, the Court finds the final factor weighs slightly in Ring's favor.

While several of the *Howe* factors weigh equally in favor of Ring and Graham, the final factor, which goes to the heart of whether a party's failure to disclose or late disclosure is harmless or substantially justified, leans toward Ring. On this analysis, the Court finds that Ring is entitled to attorney's fees relating to the Pepsi discovery and subsequent deposition of Mr. Howell. Like the Kraft-Heinz discovery, however, the Court will limit Ring's recovery to (1) the fees and costs associated with obtaining the Pepsi discovery after the Court's May 29, 2025 Opinion issued; and

(2) the fees and costs associated with scheduling and taking Mr. Howell's second deposition, relating to the Pepsi discovery.

C. Emails

As to the emails, Graham states that following the Court's June 20, 2025 Order, which clarified the scope of permissible extended discovery, Ring requested six additional custodians and date ranges for electronic discovery searches. (DN 377, at PageID # 15792). Graham reports that it agreed to the searches for all but one custodian and on June 26, 2025, produced 28 documents obtained through these searches. (*Id.* at PageID # 15792-93). These emails, Graham argues, were not "previously requested by Ring" in discovery because the ESI protocol agreed to by the Parties and approved by the Court distinguished email discovery from general production requests under Rule 34. (*Id.* at PageID # 15796). Because Ring did not previously request this email discovery, Graham argues Ring is not entitled to seek any fees. (*Id.*). Ring's briefing does not separately address whether the email searches performed during the extended discovery period fall within the scope of the Court's May 29, 2025 Opinion.

Unlike the Kraft-Heinz and Pepsi discovery, it is less clear whether the email searches conducted and emails produced in the extended discovery period relating to Kraft-Heinz fall within the scope of the Court's May 29, 2025 Opinion. In requesting additional discovery from Graham in the extended period, Ring separated its requests for "(1) documents responsive to Ring's previously served discovery requests related to Graham's prior sales and negotiations . . ." from its requests for "(2) emails sent or received by the Graham personnel who prepared materials for or attended the March 2013 meeting between Heinz and Graham." (DN 369, at PageID # 15491-92 (citing DN 242; DN 252)). Although Ring did not ask for these specific email searches during the original discovery period, it seems that some of the emails relating to Kraft-Heinz negotiations

were directly responsive to Ring's original discovery requests. Unfortunately, nowhere in the briefing does either party identify the substance of the 28 documents produced as a result of these email searches. Nor does either party demonstrate that these 28 documents constituted material evidence from Kraft-Heinz or Pepsi negotiations that would have been responsive to Ring's initial discovery requests. Under these circumstances, the Court cannot find the email discovery during the extended period falls within the scope of the attorneys' fees that Ring can seek from the Court's May 29, 2025 Opinion.

IV. Order

**IT IS THEREFORE ORDERED** that Defendant Ring Container Technologies, LLC's Motion for Attorneys' Fees (DN 369) is **GRANTED in part and DENIED in part.**

**IT IS FURTHER ORDERED** that **within twenty-one (21) days** from the date of entry of this Order, Defendant Ring may file a motion itemizing its reasonable attorneys' fees and costs for its efforts expended following the Court's May 29, 2025 Opinion to obtain the fees and costs associated with:

(1) obtaining the Kraft-Heinz discovery;

(2) scheduling and taking Mr. Denner's fourth deposition;

(3) obtaining the Pepsi discovery; and

(4) scheduling and taking Mr. Howell's second deposition.

**IT IS FURTHER ORDERED** that Defendant Ring's motion should include adequate support for the attorneys' requested hourly rates.

September 11, 2026

Regina S. Edwards, Magistrate Judge
United States District Court

Copies: Counsel of Record